WILLIAM BRIAN HALES AND DONNA HALES v. NORTH CAROLINA INSURANCE GUARANTY ASSOCIATION

No. 418PA93

(Filed 29 July 1994)

1. **Judgments § 233, 223 (NCI4th)— automobile liability policy—whether policy in effect—previous action—guardian ad litem and minor—res judicata and collateral estoppel—virtual representation**

   Plaintiffs were not barred by the doctrines of *res judicata* or collateral estoppel, and the doctrine of virtual representation was not adopted, where plaintiff Brian Hales was injured while riding in a car driven by his brother on which his father had obtained insurance; his father filed a declaratory judgment action to determine insurance coverage; summary judgment was granted for the insurance company; Brian Hales and his mother instituted a tort action against his father and brother; a default judgment was entered; Brian and his mother brought a declaratory judgment action seeking a declaration that an insurance policy was in force; the insurance company was declared insolvent; this action was brought against the Insurance Guaranty Association; and the trial court granted the Association's motion for summary judgment on the grounds that plaintiff's claims had been adjudicated in the declaratory judgment action brought by the father. A minor is not bound by a proceeding in which he or she was not a party and in which he or she was not represented by a general guardian, a guardian ad litem, or a next friend, and Brian's mother was not a party to the action and was not in privity with his father because his interest was that of a potential tortfeasor in establishing that a policy was in effect, while her interest was to recover losses resulting from medical expenses whether that recovery came from the tortfeasor or the insurance carrier. Although the Association argued for the adoption of the doctrine of virtual represen-

tation, the N.C. Supreme Court declined to adopt that doctrine because courts have been unable to apply the doctrine with precision and because the traditional doctrines of *res judicata,* collateral estoppel, and privity, while imperfect, have provided the courts of this state with a fair and workable approach.

**Am Jur 2d, Judgments §§ 518 et seq., 567 et seq.**

2. **Insurance § 635 (NCI4th)— automobile liability insurance—notice of cancellation—not effective**

An automobile liability insurance policy was in effect at the time an accident occurred where the insurance company failed to satisfy the requirements of N.C.G.S. § 20-310(f), as it appeared at the time of the accident, in that uncontroverted evidence before the trial court tended to show that the policyholder received a premium notice which merely stated that the policy was "up for renewal on April 5, 1985" and requested that he pay the premium amount of $313.00 "before the renewal date to avoid a lapse in coverage"; the notice indicated that the policy would remain in effect upon renewal until 5 October 1985 and that "[a]ll premiums are due and payable upon effective date of policy"; there was no forecast of evidence tending to show that the Commissioner of Insurance had previously approved the form of the notice; and the notice did not state the date on which any cancellation or refusal to renew would become effective, a date which "must be expressly and carefully specified with certainty" in order to comply with the requirements of N.C.G.S. § 20-310(f). Although the insurance company still could have complied with the statute by satisfying the requirements of N.C.G.S. § 20-310(g), the premium notice in the present case was insufficient to accomplish this task in that it neither expressly informed the insured that his policy was about to expire nor apprised him of the date of expiration and failed to satisfy the requirement that the insurer manifest its willingness to renew. If the General Assembly had intended to allow for such a manifestation by an agent or broker of the insurer, it easily could have and would have done so.

**Am Jur 2d, Automobile Insurance §§ 38, 39.**

3. **Insurance § 43 (NCI4th)— Insurance Guaranty Association—covered claim—summary judgment**

Entry of summary judgment for plaintiffs would be inappropriate where there were a number of genuine issues of material

**HALES v. N.C. INSURANCE GUARANTY ASSN.**

[337 N.C. 329 (1994)]

fact remaining with regard to whether plaintiffs possessed a "covered claim" within the statutory meanings. N.C.G.S. § 58-48-20(4); N.C.G.S. § 58-48-35(a)(1).

**Am Jur 2d, Insurance § 874.**

On discretionary review pursuant to N.C.G.S. § 7A-31 of a decision of the Court of Appeals, 111 N.C. App. 892, 433 S.E.2d 468 (1993), affirming an order entered by Greene, J., on 20 April 1992, in the Superior Court, Wake County. Heard in the Supreme Court on 9 May 1994.

*Mast, Morris, Schulz & Mast, by Bradley N. Schulz and George B. Mast, for the plaintiff-appellants.*

*Moore & Van Allen, by Joseph W. Eason, Christopher J. Blake and Martin H. Brinkley, for the defendant-appellee.*

MITCHELL, Justice.

The primary issue before us in this case is whether the plaintiffs' claims are barred by the doctrines of *res judicata* or collateral estoppel. We hold that they are not; therefore, we reverse the decision of the Court of Appeals.

The pleadings and forecast of evidence before the trial court tended to show the following. William I. Hales, the father of the plaintiff W. Brian Hales, procured automobile liability insurance through Cotton Insurance and Realty Co. (hereinafter "Cotton") in 1968. Due to an arrangement between Cotton and Interstate Casualty Insurance Company (hereinafter "Interstate"), the exact nature of which is unclear, Cotton subsequently designated Interstate as the company that would provide automobile liability insurance to William Hales. This occurred in December of 1984.

In January of the following year, William Hales amended his policy by adding a 1977 Plymouth and a 1979 Buick and deleting a 1974 Dodge Dart. As a result of this amendment, William Hales received an invoice from Cotton seeking an additional premium in the amount of $155.00. When William did not pay this additional amount, he received a "Notice of Cancellation or Refusal to Renew" from Interstate, explaining that it intended to terminate his policy on 2 March 1985. William paid the $155.00 premium to Cotton on 1 March 1985 and subsequently received a notice from Interstate informing him that his policy had been "reinstated with no lapse in coverage."

On 4 March 1985, Cotton sent William Hales a premium notice which stated, in pertinent part, as follows:

Your auto policy is up for renewal on April 5, 1985. Please have your payment in our office before the renewal date to avoid a lapse in coverage. Thank you.

The notice also indicated that the amount of the payment to be made was $313.00. William Hales never paid the $313.00 and received no further correspondence from Interstate or Cotton.

On 29 May 1985, Brian Hales was injured in an automobile accident while a passenger in the 1979 Buick. Brian's brother, Robert Hales, was driving.

William Hales subsequently filed a declaratory judgment action against Interstate on 21 November 1985 seeking a declaration that, *inter alia*, the Interstate policy was in effect on the date of the accident. Neither Brian nor his mother, Donna Hales, were parties to this action. The trial court granted Interstate's motion for summary judgment on the ground that the policy was not in effect on the date of Brian's accident.

On 12 February 1987, Brian Hales (through a guardian ad litem) and his mother, Donna Hales, instituted a tort action against William and Robert Hales seeking damages and medical expenses. Interstate was notified of the action but declined to defend William and Robert Hales. The trial court entered a default judgment (1) concluding that Robert Hales had been negligent and that his negligence had proximately caused Brian's injuries, (2) imputing Robert's negligence to William Hales under the family purpose doctrine and (3) awarding Brian $75,000 in damages for his personal injuries and Brian's mother $17,758 for Brian's medical expenses.

On 25 February 1988, Brian Hales (through a guardian ad litem) and his mother brought a declaratory judgment action against Interstate and Cotton seeking a declaration that, *inter alia*, the Interstate policy issued to William Hales was in effect on the date of Brian's accident. While this action was pending, Interstate was declared insolvent. Pursuant to the provisions of the Insurance Guaranty Association Act, N.C.G.S. §§ 58-48-1 to 58-48-130, the North Carolina Insurance Guaranty Association (hereinafter "Association") assumed "all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." N.C.G.S. § 58-48-35(a)(2) (1991 & Supp. 1993); *see also* N.C.G.S. § 58-48-5 (1991).

Brian Hales and his mother (hereinafter "plaintiffs") therefore instituted the present declaratory judgment action against the Association on 21 November 1991 seeking a declaration that, *inter alia*, (1) Interstate's policy was in effect on the date of the accident and (2) the Association is obligated to pay the limits of the liability coverage under the policy pursuant to the Insurance Guaranty Association Act. Both parties moved for summary judgment. The trial court denied the plaintiffs' motion and granted the Association's motion on the ground that the plaintiffs' claims had been adjudicated in the 1985 declaratory judgment action between William Hales and Interstate.

The Court of Appeals affirmed, agreeing with the trial court that the doctrine of *res judicata* bars the plaintiffs' claims against the Association. *Hales v. N.C. Insurance Guaranty Assn.*, 111 N.C. App. 892, 896, 433 S.E.2d 468, 471 (1993). We allowed the plaintiffs' petition for discretionary review on 3 December 1993. *Hales v. N.C. Insurance Guaranty Assn.*, 335 N.C. 237, 439 S.E.2d 146 (1993).

[1] By their first assignment of error, the plaintiffs contend that their cause of action against the Association is not barred by the doctrine of *res judicata*. The plaintiffs therefore insist that the Court of Appeals erred in affirming the trial court's grant of the Association's motion for summary judgment. We agree.

Under the doctrine of *res judicata* (or "claim preclusion"), "a final judgment on the merits in a prior action will prevent a second suit based on the same cause of action between the same parties or those in privity with them." *Thomas M. McInnis & Assoc., Inc. v. Hall*, 318 N.C. 421, 428, 349 S.E.2d 552, 556 (1986). Under the companion doctrine of collateral estoppel (or "issue preclusion"), "parties and parties in privity with them—even in unrelated causes of action— are precluded from retrying fully litigated issues that were decided in any prior determination [between the parties or their privies] and were necessary to the prior determination." *King v. Grindstaff*, 284 N.C. 348, 356, 200 S.E.2d 799, 805 (1973). Thus, while *res judicata* precludes a subsequent action between the same parties or their privies based on the same *claim*, collateral estoppel precludes the subsequent adjudication of a previously determined *issue*, even if the subsequent action is premised upon a different claim. *Hall*, 318 N.C. at 427, 349 S.E.2d at 556; *King*, 284 N.C. at 356, 200 S.E.2d at 805.

As this Court has recognized, the meaning of "privity" for purposes of *res judicata* and collateral estoppel is somewhat elusive. *Settle v. Beasley*, 309 N.C. 616, 620, 308 S.E.2d 288, 290 (1983). Indeed,

**HALES v. N.C. INSURANCE GUARANTY ASSN.**

[337 N.C. 329 (1994)]

"[t]here is no definition of the word 'privity' which can be applied in all cases." *Masters v. Dunstan*, 256 N.C. 520, 524, 124 S.E.2d 574, 577 (1962). The prevailing definition that has emerged from our cases is that "privity" for purposes of *res judicata* and collateral estoppel "denotes a mutual or successive relationship to the same rights of property." *Settle*, 309 N.C. at 620, 308 S.E.2d at 290; *see also Bank v. Casualty Co.*, 268 N.C. 234, 239, 150 S.E.2d 396, 401 (1966); *Masters*, 256 N.C. at 525, 124 S.E.2d at 577; *Hayes v. Ricard*, 251 N.C. 485, 492, 112 S.E.2d 123, 128 (1960); *Light Co. v. Insurance Co.*, 238 N.C. 679, 689, 79 S.E.2d 167, 174 (1953), *reh'g denied*, 240 N.C. 196, 81 S.E.2d 404 (1954); *Rabil v. Farris*, 213 N.C. 414, 416, 196 S.E. 321, 322 (1938). The Association argues that the plaintiffs and William Hales have such a "mutual or successive relationship to the same rights of property" and therefore the plaintiffs are bound by the result of William Hales' 1985 declaratory judgment action against Interstate. We do not agree.

We long have recognized that a minor is not bound by a proceeding in which he or she was not a party and in which he or she was not represented by a general guardian, a guardian ad litem or a next friend. *Bank v. Casualty Co.*, 268 N.C. 234, 241, 150 S.E.2d 396, 402-03. In such a situation, neither the doctrine of *res judicata* nor the doctrine of collateral estoppel operates to bar a subsequent action brought by the minor.

In *Bank v. Casualty Co.*, a minor, through her present guardian, brought an action against her former guardian and the surety on the bond of her former guardian, alleging that the former guardian had mismanaged and misappropriated funds. In a prior action by the surety against the former guardian, however, the trial court had concluded that the former guardian was innocent of any wrongdoing and that the surety and the former guardian therefore were " 'forever discharged and acquitted from any liability' by virtue of the guardianship and bond." *Id.* at 236, 150 S.E.2d at 399. The surety and the former guardian maintained, and the trial court agreed, that the minor and her present guardian were bound by this prior judgment.

This Court reversed, emphasizing that neither the present guardian nor the minor had been parties to the prior action. *Id.* at 241, 150 S.E.2d at 402-03. While the present guardian had been named as a defendant in the prior action, the trial court had sustained the present guardian's demurrer and had dismissed it from the proceeding. Similarly, while the minor had participated in the prior action as a witness,

she had not been a party to the prior action and had not been represented by a guardian. This Court held that since the present guardian "was not a party to the proceeding instituted by [the surety] at the time of the entry of the judgment [in that prior action] . . . that judgment is not binding upon the [present guardian] and the doctrine of *res judicata* has no application." *Id.* at 241, 150 S.E.2d at 402. This Court further held that "a minor, called as a witness in a proceeding to which she was not a party and in which she was not represented by a general guardian, a guardian *ad litem*, or a next friend, should not be precluded by a judgment entered therein." *Id.* Therefore, we concluded that the present guardian, "on behalf of its ward, [was] entitled to its day in court and to an opportunity to establish its right, if any, to recover of [the former guardian] and the surety on [the] bond." *Id.* at 241, 150 S.E.2d at 402-03.

We likewise conclude in the present case that the plaintiff Brian Hales is entitled to an opportunity to establish his right to recover from the Association. Brian Hales, a minor in 1985, was not a party to the declaratory judgment action instituted by his father and was not represented in that action by a general guardian, a guardian ad litem or a next friend. Therefore, he is not bound by the result in that action and is not precluded from bringing this action by the doctrine of *res judicata* or the doctrine of collateral estoppel.

We also conclude that the plaintiff Donna Hales is entitled to an opportunity to establish her right to recover from the Association. Donna Hales, like the guardian in *Bank v. Casualty Co.*, was not a party to the declaratory judgment action instituted by William Hales at the time of the entry of the judgment in that action. Further, Donna Hales was not in privity with William Hales. At the time of his 1985 declaratory judgment action, William Hales was a potential tortfeasor by operation of the family purpose doctrine. His interest was to establish that the Interstate policy was in effect on the date of the accident which in turn would obligate Interstate to defend him in any subsequent tort action and to pay the liability limits of the policy should the injured parties prevail. The interest of Donna Hales, however, is simply to recover for her losses resulting from Brian's medical expenses. She is unconcerned with whether this recovery ultimately will come from the tortfeasor or the tortfeasor's insurance carrier. She thus "had a personal, but *not* a legal, interest in the outcome" of the 1985 declaratory judgment action. *Masters*, 256 N.C. at 526, 124 S.E.2d at 578 (emphasis added). Therefore, Donna Hales and William Hales did not have a "mutual or successive relationship to the same rights of

property." Accordingly, Donna Hales was not in privity with William Hales at the time of the 1985 declaratory judgment action and is not precluded from bringing the present action by the doctrine of *res judicata* or the doctrine of collateral estoppel.

The Association, however, would have us abandon these traditional principles and preclude the plaintiffs' action through use of the doctrine of "virtual representation." Under this doctrine, "a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." *Aerojet-General Corporation v. Askew*, 511 F.2d 710, 719 (5th Cir.), *cert. denied*, 423 U.S. 908, 46 L. Ed. 2d 137 (1975); *see also generally* Robert G. Bone, *Rethinking the "Day in Court" Ideal and Nonparty Preclusion*, 67 N.Y.U. L. Rev. 193, 203-32 (1992) [hereinafter Bone] (analyzing the historical development of the virtual representation doctrine). We decline to adopt this doctrine.

The doctrine of virtual representation apparently originated in the eighteenth century as a means by which courts of equity could "bind persons holding remainder and reversionary interests in real property to a decree adjudicating property rights as long as the owner of the first vested estate of inheritance . . . was made a party to the suit." Bone, 67 N.Y.U. L. Rev. at 206. The nineteenth century saw an expansion of the doctrine beyond its real property origins. *Id.* at 209-11. Taxpayers, for example, were held to be bound by prior judgments entered in "public rights suits" challenging the legitimacy of government action. *Id.* at 210 (citing *Harmon v. Auditor of Public Accounts*, 123 Ill. 122, 132, 13 N.E. 161, 163-64 (1887) (holding that a challenge by taxpayers and property owners to the issuance of municipal bonds was barred by a judgment entered in a prior action)).

The doctrine of virtual representation fell into disfavor in the early part of this century, however, due primarily to the desire of the courts to afford nonparties their own "day in court." *Id.* at 213. Indeed, "[b]y the end of the 1930s, references to 'virtual representation' all but disappeared from the res judicata and class action literature." *Id.* at 212.

The "modern revival" of the virtual representation doctrine seems to have been triggered by the opinion of the United States Court of Appeals for the Fifth Circuit in *Aerojet-General Corporation v. Askew*, 511 F.2d 710 (5th Cir. 1975). *See* Bone, 67 N.Y.U. L. Rev. at 218-221. In holding that the defendants were bound by a judgment entered in a prior action to which they were not a party, the court set forth

## HALES v. N.C. INSURANCE GUARANTY ASSN.

[337 N.C. 329 (1994)]

what has become the paradigmatic statement of the virtual representation doctrine: "a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." *Askew*, 511 F.2d at 719; *see also* Bone, 67 N.Y.U. L. Rev. at 219.

The "promise of broader preclusion" offered by *Askew* "has never been realized," however. Bone, 67 N.Y.U. L. Rev. at 220. Indeed, just two years later, the United States Court of Appeals for the Fifth Circuit retreated somewhat from its opinion in *Askew*, explaining that the doctrine of virtual representation "offers little analytical assistance . . . because of its wide and inconsistent application." *Southwest Airlines Co. v. Texas Intern. Airlines*, 546 F.2d 84, 97 (5th Cir.), *cert. denied*, 434 U.S. 832, 54 L. Ed. 2d 93 (1977); *see also* Bone, 67 N.Y.U. L. Rev. at 223. The Court of Appeals for the Fifth Circuit eventually restricted its use of the doctrine by requiring "the existence of an express or implied legal relationship in which parties to the first suit are *accountable* to non-parties who file a subsequent suit raising identical issues." *Pollard v. Cockrell*, 578 F.2d 1002, 1008 (5th Cir. 1978) (emphasis added); *see also* Bone, 67 N.Y.U. L. Rev. at 223-31. Other courts have experienced similar difficulties when attempting to apply the virtual representation doctrine. *See, e.g., Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1125 (7th Cir. 1987) (noting that "no uniform pattern has emerged from the cases [applying the doctrine of virtual representation]"); *General Foods v. Mass. Dept. of Public Health*, 648 F.2d 784, 790 (1st Cir. 1981) ("doubt[ing the] soundness" of the doctrine of virtual representation).

The revival of the virtual representation doctrine thus has resulted in "a collection of seemingly ad hoc decisions with no clear organizational framework." Bone, 67 N.Y.U. L. Rev. at 220; *see also* Marjorie A. Silver, *Fairness and Finality: Third-Party Challenges to Employment Discrimination Consent Decrees After the 1991 Civil Rights Act*, 62 Fordham L. Rev. 321, 356 (1993) ("The cases [applying the doctrine of virtual representation] are sporadic, and the doctrine often idiosyncratic."). Accordingly, it seems clear that courts have been unable to apply the doctrine with sufficient precision to be said to be "close enough" even for government work. It is for this reason, in part, that we choose not to adopt it in the present case.

In addition, we decline to adopt the doctrine of virtual representation because it would amount to no less than an abandonment of our traditional concepts of *res judicata*, collateral estoppel and priv-

HALES v. N.C. INSURANCE GUARANTY ASSN.

[337 N.C. 329 (1994)]

ity. Though perhaps imperfect, these doctrines have provided the courts of this state with a fair and workable approach to analyzing the effects of prior adjudication for many years and we find no compelling reason to abandon them.

For the foregoing reasons, we have concluded that the plaintiffs are not barred by our traditional doctrines of *res judicata* or collateral estoppel. Further, we have declined to adopt the doctrine of virtual representation and therefore need not consider whether its application would preclude the plaintiffs from bringing this action.

[2] By another assignment of error, the plaintiffs contend that the Court of Appeals erred in affirming the trial court's grant of the Association's motion for summary judgment because the plaintiffs are entitled to judgment as a matter of law.[1] Specifically, the plaintiffs argue that they are entitled to recover from the Association because (1) the Interstate policy was in effect on the date of Brian Hales' accident and (2) there are no other genuine issues of material fact with regard to their right to recover from the Association. While we agree that the policy was in effect on the date of the accident, we believe that genuine issues of material fact remain with regard to whether the plaintiffs have a "covered claim" within the meaning of the Insurance Guaranty Association Act.

The question of whether the Interstate policy was in effect on 29 May 1985, the date of Brian Hales' accident, is governed by the provisions of N.C.G.S. § 20-310 as they appeared at the time of the accident.[2] At that time N.C.G.S. § 20-310(f) provided, in pertinent part, as follows:

(f) No cancellation or refusal to renew by an insurer of a policy of automobile insurance shall be effective unless the insurer shall have given the policyholder notice at his last known post-office address by certificate of mailing a written notice of the cancellation or refusal to renew.

Subsection (f) further provided that this notice must: (1) have received the prior approval of the Commissioner of Insurance, (2) state the date on which the cancellation or refusal to renew would become effective, (3) state the specific reason or reasons for the can-

---

1. The Court of Appeals did not consider this issue since it determined that the plaintiffs' claims were barred by the doctrine of *res judicata*.

2. Since the date of Brian Hales' accident, the General Assembly of North Carolina has amended N.C.G.S. § 20-310 on five occasions.

cellation or refusal to renew, (4) advise the insured of his right to request a review by the Commissioner of Insurance of the insurer's actions in cancelling or refusing to renew and (5) advise the insured "that operation of a motor vehicle without complying with the provisions of this Article is a misdemeanor and specify[] the penalties for such violation." N.C.G.S. § 20-310(f) (1983) (amended 1985, 1987, 1991, 1993 and 1994). N.C.G.S. § 20-310(g) provided at that time, however, that

> (g) Nothing in this section shall apply:
>
> (1)  If the insurer has manifested its willingness to renew by issuing or offering to issue a renewal policy, certificate or other evidence of renewal, or has manifested such intention by any other means;
>
> (2)  If the named insured has notified in writing the insurer or its agent that he wishes the policy to be canceled or that he does not wish the policy to be renewed[.]

In the present case, Interstate failed to satisfy the requirements of N.C.G.S. § 20-310(f). Uncontroverted evidence before the trial court tended to show that the policyholder, William Hales, received a premium notice which merely stated that the Interstate policy was "up for renewal on April 5, 1985" and requested that he pay the premium amount of $313.00 "before the renewal date to avoid a lapse in coverage." In addition, the notice indicated that upon renewal, the policy would remain in effect until 5 October 1985 and that "[a]ll premiums are due and payable upon effective date of policy." There was no forecast of evidence tending to show that the Commissioner of Insurance had previously approved the form of the notice. Further, the notice did not state the date on which any cancellation or refusal to renew would become effective, a date which "must be expressly and carefully specified with certainty" in order to comply with the requirements of N.C.G.S. § 20-310(f). *Pearson v. Nationwide Mutual Ins. Co.*, 325 N.C. 246, 253, 382 S.E.2d 745, 748 (1989). Finally, the notice failed to apprise William Hales of his right to request a review by the Commissioner of Insurance or of the possible penalties for failing to maintain liability insurance on his automobiles. The premium notice therefore failed to satisfy the requirements of N.C.G.S. § 20-310(f).

Interstate still could have complied with the statute, however, by satisfying the requirements of N.C.G.S. § 20-310(g). While we have indicated in the past that a premium notice alone could satisfy the

requirements of N.C.G.S. § 20-310(g), *see Smith v. Nationwide Mut. Ins. Co.*, 315 N.C. 262, 269, 337 S.E.2d 569, 573 (1985), the premium notice in the present case was insufficient to accomplish this task. In *Smith*, we emphasized that the premium notice in question

> specifically tells [the insured] that his policy is going to expire and states in two places the date on which the policy will expire. It also states, in a prominent location, "This is renewal notice for your policy which expires on the above date," and is subtitled, "Semi-annual renewal for policy term beginning 6-22-79." On the back side of the form, the expiration date appears again, as well as an itemized list of the coverage type, policy limits, and premium, at the bottom of which the total "RENEWAL PREM" amount appears.

*Id.* at 269, 337 S.E.2d at 574. As such, the premium notice in *Smith* was "more than 'simply a statement of an account that will be due on the date indicated.' " *Id.* (quoting *Insurance Co. v. Davis*, 7 N.C. App. 152, 160, 171 S.E.2d 601, 605 (1970)). The same cannot be said of the premium notice in the present case.

Unlike the notice in *Smith*, the premium notice in the present case neither expressly informed William Hales that his policy was about to expire nor apprised him of the date of expiration. The notice in the case at bar was "simply a statement of an account that will be due on the date indicated" and therefore failed to constitute a manifestation of Interstate's willingness to renew within the meaning of N.C.G.S. § 20-310(g). *Id.*

Even had the premium notice in question constituted a manifestation of Interstate's willingness to renew, it nevertheless would have failed to satisfy the statute since N.C.G.S. § 20-310(g)(1) requires that the *insurer* have manifested its willingness to renew. The premium notice in the present case was sent not by Interstate, the insurer, but by Cotton.

The Association contends, however, that Cotton was an "insurance broker" for Interstate and therefore "had authority to act on Interstate's behalf with respect to the renewal of the Interstate policy." To adopt the Association's position in this regard would be to contravene the plain language of the statute. At all pertinent times, N.C.G.S. § 20-310(g)(2) provided that the other requirements of the statute did not apply if the insured had notified either "the insurer *or its agent*" that the insured did "not wish the policy to be renewed."

**HALES v. N.C. INSURANCE GUARANTY ASSN.**

[337 N.C. 329 (1994)]

N.C.G.S. § 20-310(g)(1), however, provided that the requirements of the statute would not apply if "the *insurer* [had] manifested *its* willingness to renew." If the General Assembly had intended to allow for such a manifestation by an agent or broker of the insurer, it easily could have and would have done so. This is apparent from the fact that the General Assembly expressly included an agent of the insured within the language of subsection (g)(2). *Cf. In re Appeal of Philip Morris U.S.A.*, 335 N.C. 227, 230, 436 S.E.2d 828, 831 (1993) (having expressly prohibited contingent fees in a number of other settings where it deemed them to be inappropriate, the General Assembly would have expressly prohibited them in N.C.G.S. § 105-299 had it intended such a prohibition), *reh'g denied*, 335 N.C. 566, 441 S.E.2d 118, *cert. denied*, ⸺ U.S. ⸺, ⸺ L. Ed. 2d ⸺ (1994). In addition, the statutory definition of "insurer" contained in N.C.G.S. § 20-310(a)(3) does not include agents or brokers of the insured. *See In re Clayton-Marcus Co.*, 286 N.C. 215, 219, 210 S.E.2d 199, 203 (1974) (where the statute itself contains a definition of a word used in the statute, the statutory definition controls even if contrary to the ordinary meaning of the word).

The Association argues, however, that the phrase "by any other means" appearing in the 1985 version of N.C.G.S. § 20-310(g)(1) contemplated a manifestation of the insurer's willingness to renew by persons other than the insurer. We disagree. Instead, we interpret this phrase to refer to other *methods* of manifestation by the *insurer* itself. This interpretation is supported by the present version of the statute. Subsequent to the date of Brian Hales' accident, the General Assembly amended N.C.G.S. § 20-310(g)(1) to read: "by any other means, including the mailing by first-class mail of a premium notice or expiration notice." N.C.G.S. § 20-310(g)(1) (1993). This indicates that through its use of the phrase "by any other means," the General Assembly contemplated other *methods* of notice by the *insurer*, not notice by persons or entities other than the insurer. *See Cooke v. Outland*, 265 N.C. 601, 609, 144 S.E.2d 835, 840 (1965) (this Court deemed an amendment to the former N.C.G.S. § 55-38 to be pertinent in an action instituted prior to the amendment's effective date for the purpose of showing that prior to the amendment, the General Assembly considered the statute to be applicable to banking corporations).

For the foregoing reasons, we conclude that Interstate failed to satisfy the requirements of N.C.G.S. § 20-310. As we explained in *Pearson*, "[i]n order to cancel a policy the carrier must comply with the procedural requirements of the statute or the attempt at cancella-

tion fails and the policy will continue in effect despite the insured's failure to pay in full the required premium." *Pearson*, 325 N.C. at 254, 382 S.E.2d at 748. Therefore, we conclude as a matter of law that the Interstate automobile liability insurance policy issued to William Hales was in effect on 29 May 1985, the date of Brian Hales' accident.

**[3]** We further conclude, however, that the plaintiffs are not entitled to summary judgment in their favor because genuine issues of material fact remain with regard to whether the plaintiffs are entitled to recover from the Association. The Association is "a nonprofit, unincorporated legal entity" composed of all insurers that (1) are "licensed and authorized to transact insurance in this State" and (2) "write[] any kind of insurance to which [the Insurance Guaranty Association Act] applies." N.C.G.S. §§ 58-48-25, -20(6) (1991 & Supp. 1993). The purpose of the Association is, in part, "to provide a mechanism for the payment of covered claims under certain insurance policies . . . and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer." N.C.G.S. § 58-48-5 (1991).

Under the Act, the Association is "obligated [only] to the extent of . . . covered claims." N.C.G.S. § 58-48-35(a)(1) (Supp. 1993). The Act defines a "covered claim" as

> an unpaid claim . . . which is in excess of fifty dollars ($50.00) and arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Article applies as issued by an insurer, if such insurer becomes an insolvent insurer after the effective date of this Article and (i) the claimant or insured is a resident of this State at the time of the insured event; or (ii) the property from which the claim arises is permanently located in this State.

N.C.G.S. § 58-48-20(4) (Supp. 1993). A "covered claim" does not include, however, "any amount awarded as punitive or exemplary damages; sought as a return of premium under any retrospective rating plan; or due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation or contribution recoveries or otherwise." *Id.*

The Association is obligated to pay "only the amount of each covered claim that is in excess of fifty dollars ($50.00) and is less than three hundred thousand dollars ($300,000)." N.C.G.S. § 58-48(a)(1). Further, the Association

> has no obligation to pay a claimant's covered claim, except a claimant's worker's compensation claim, if:

HALES v. N.C. INSURANCE GUARANTY ASSN.

[337 N.C. 329 (1994)]

a. The insured had primary coverage at the time of the loss with a solvent insurer equal to or in excess of three hundred thousand dollars ($300,000) and applicable to the claimant's loss; or

b. The insured's coverage is written subject to a self-insured retention equal to or in excess of three hundred thousand dollars ($300,000).

If the primary coverage or self-insured retention is less than three hundred thousand dollars ($300,000), the Association's obligation to the claimant is reduced by the coverage and the retention.

*Id.* Finally, the Act provides that "[i]n no event shall the Association be obligated to a policyholder or claimant in an amount in excess of the obligation of the insolvent insurer under the policy from which the claim arises." *Id.*

Summary judgment is appropriate only where there is no genuine issue as to any material fact. *Mozingo v. Pitt County Memorial Hospital*, 331 N.C. 182, 187, 415 S.E.2d 341, 344 (1992); *see also* N.C.G.S. § 1A-1, Rule 56 (1990). In the present case, a number of genuine issues of material fact remain with regard to whether the plaintiffs possess a "covered claim" within the meaning of the foregoing provisions of the Act and to what extent, if any, the Association is obligated under the Act to pay that covered claim. An entry of summary judgment in favor of the plaintiffs therefore would be inappropriate.

For the foregoing reasons we hold that the Court of Appeals erred in affirming the trial court's grant of summary judgment in favor of the Association. Accordingly, we reverse the decision of the Court of Appeals and remand this case to that court for its further remand to the Superior Court, Wake County, for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.