IN THE SUPREME COURT OF NORTH CAROLINA

No. 265PA24

Filed 12 December 2025

IN THE MATTER OF: A.D.H.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 295 N.C. App. 480 (2024), vacating and remanding an order entered on 19 September 2022 by Judge W. David McFadyen III in District Court, Carteret County. Heard in the Supreme Court on 28 October 2025.

*Carolina Law Group, by Kirby H. Smith III, for petitioner-appellant Carteret County Department of Social Services.*

*Matthew D. Wunsche for appellant Guardian ad Litem.*

*Sundee G. Stephenson and Bradley N. Schulz for respondent-appellee father.*

*No brief for respondent-appellee mother.*

*Marc S. Gentile, Jason Hicks, Melissa Livesay, Mary Holliday, Mona Leipold, Rachael Hawes, and Brian Godfrey for North Carolina Association of Social Services Attorneys, amicus curiae.*

*Jeff Jackson, Attorney General, by Nicholas S. Brod, Solicitor General, Andrew L. Hayes, Assistant Attorney General, and Maria B. Lattimore, Assistant Attorney General, for North Carolina Department of Health and Human Services, amicus curiae.*

BARRINGER, Justice.

In this case, we must decide whether the Court of Appeals erred by holding the juvenile petition at issue was barred by the doctrine of collateral estoppel. After

bringing our collateral estoppel doctrine into sharper focus, we reverse the Court of Appeals' conclusion that collateral estoppel is applicable and remand to the trial court for further proceedings.

## I.    Background

Minor child, Alice,[1] was born to respondent-mother (Mother) and respondent-father (Father) on 17 June 2013. Although the two never married, they resided together with Alice from the time she was born until the time they separated in 2018. In February 2021, Mother filed a complaint seeking primary custody of Alice with Father having secondary placement. The Carteret County District Court entered a temporary child custody order granting joint legal custody of Alice to both parents, with Mother having primary physical custody and Father having visitation.

One month later, in March 2021, Alice made concerning statements to one of her classmates on the playground. Alice told the classmate that she and Father had engaged in inappropriate sexual misconduct. The next day, the classmate's parent called the elementary school and reported Alice's statements to the school counselor. Alice's school counselor interviewed Alice several times throughout the day. Each time, Alice expanded on her statements, sharing more information about the inappropriate misconduct between her and Father. A formal report was made to Carteret County Department of Social Services (Carteret County DSS).

Mother's aunt was a former Carteret County DSS employee with continued

---

[1] Alice is a pseudonym to protect the juvenile's identity.

relationships with those on staff at the department. Therefore, Carteret County DSS referred Alice's report to Craven County Department of Social Services (Craven County DSS). Craven County DSS then launched an investigation, which stretched from March 2021 through the end of July 2021.

During Craven County DSS's investigation, Alice underwent a trauma screening by the Child Advocacy Center where Alice made no disclosures regarding the alleged inappropriate misconduct. A Child Medical Evaluation was also performed on Alice, which revealed no physical signs of sexual abuse. And again, Alice made no disclosures regarding the purported abuse during the Child Medical Evaluation. A Child and Family Evaluation was also completed as part of the investigation to assess possible sources of and solutions to the alleged abuse. As the investigation unfolded, however, the staff involved grew concerned that Alice had not been abused by Father but instead had been coached by Mother to provide false accusations. Craven County DSS social worker Rondy Johnson suspected that Mother was encouraging Alice's false narrative to secure a higher child support award from Father. Consequently, Craven County DSS deemed the March 2021 allegations unsubstantiated and closed its case on 30 July 2021.

Despite the investigation's conclusions, Mother continued to deny Father contact with Alice. Mother also enrolled Alice in therapy with a substance abuse counselor that the trial court found to be unqualified to counsel minor children and, as the trial court put it, "was quite possibly [e]ndorsing a false narrative when

counseling [Alice]." Father filed four show cause motions, formally requesting visitation. Yet Mother denied Alice contact with Father.

As soon as these formal visitation requests were filed, a second report was made to DSS, alleging the same unsubstantiated sexual misconduct that Alice shared back in March 2021. However, this time, the report came from the unqualified therapist. In response, Craven County DSS opened a second investigation into the matter. The second investigation produced findings identical to the first: Mother was coaching Alice, Father had done nothing wrong, and the therapist was unqualified to counsel Alice.

The permanent child custody action came on for a hearing in November 2021 and was continued into March 2022. The parties to the child custody action, Father and Mother, were both represented by counsel. During the hearing, the trial court heard testimony from various witnesses, including Craven County DSS social workers, an expert in child abuse and trauma, and both parents. At the conclusion of the child custody hearing, the trial court, by child custody order (CCO), found that "[F]ather did not abuse [Alice] in any way," "[M]other when testifying made clear that she had willfully and intentionally denied [Father] contact and visitation with [Alice] and [Mother] knew she was in violation of the [c]ourt's [order]," and "[M]other's testimony at the hearing in this matter was untruthful." The CCO ordered Father to have primary legal and physical custody of Alice, and Mother to be punished for her untruthful testimony and be found in contempt for denying Father visitation.

Soon after, on 28 March 2022, Alice's school counselor made another report of inappropriate sexual misconduct by Father to Carteret County DSS. This abuse allegedly occurred the previous weekend. Carteret County DSS interviewed Alice at the Child Advocacy Center. Following the interview, Carteret County DSS recommended that Alice participate in another Child Medical Examination. Father refused to subject Alice to yet another physical examination and pointed to the CCO's directive that "[n]o one, other than the child's current, qualified therapist shall discuss any aspect of . . . the past allegations against [Father] with the minor child. This includes the child's guidance counselor(s)."

Father's refusal prompted Craven County DSS to file an interference petition requesting, among other things, an order to complete the medical examination. Father moved for dismissal. A hearing for the interference petition was held on 17 June 2022, and the trial court issued an interference petition order (IPO). The IPO observed that the "Craven County DSS attorney . . . stated to the [c]ourt that DSS could complete its[] investigation without requiring a medical evaluation of the child." The IPO therefore concluded, "[g]ood cause exist[ed] to grant [Father's] Motion to Dismiss [the interference petition], with prejudice."

Shortly after the hearing, Alice attended a sleepover. At the sleepover, Alice shared with one of her friends another allegation of sexual misconduct between her and Father. On 11 July 2022, the friend's mother made a report to Carteret County DSS. Although it was entirely unclear when this newly alleged sexual misconduct

occurred, Carteret County DSS attempted to conduct another investigation.

Father refused to cooperate, again citing the CCO. On 15 July 2022, upon Father's motion, the trial court entered a temporary emergency custody order, awarding him emergency temporary custody of Alice and restraining Mother from removing Alice from his custody.

On 29 August 2022—Alice's first day of school—Kelly Dorman, a social worker with Carteret County DSS, removed Alice from her class and questioned her about all prior allegations of abuse by Father. Based on Alice's responses to social worker Dorman's questions, Carteret County DSS filed a juvenile petition alleging Alice was an abused, neglected, and dependent juvenile. Before filing its juvenile petition, Carteret County DSS attempted to refer the matter again to Craven County DSS due to Carteret County DSS's conflict of interest. However, Craven County DSS refused to involve itself any further given the lack of evidence of abuse. Accordingly, Carteret County DSS took the lead on the juvenile petition.[2]

---

[2] This Court is seriously troubled by the apparent conflict of interest possessed by Carteret County DSS. In its juvenile petition order, the trial court found that:

> Social Worker Dorman used to work with [Mother's] Aunt, Ms. Blalock, when Ms. Blalock worked at Carteret County DSS. Further, Social Worker Dorman has been friends with Ms. Blalock on social media . . . and was tagged by Ms. Blalock in fund raising posts related directly to [Mother]. Several other Carteret County DSS employees were also tagged by Ms. Blalock on social media in fund raising posts directed at raising funds to pay legal fees for [Mother] as it relates to child custody of [Alice].

In light of this conflict, Carteret County DSS's continued participation in this matter is wholly inappropriate.

The juvenile petition alleged the same, unsubstantiated sexual misconduct that Alice shared back in March 2021 to her classmate on the playground and again in September 2021 to her unqualified therapist. These were the allegations addressed by the CCO. Additionally, the juvenile petition alleged the 28 March 2022 allegation, which had prompted Craven County DSS to file the interference petition. Finally, the juvenile petition alleged the disclosure made at the sleepover in July 2022 and the additional statements made to social worker Dorman in her 29 August 2022 interview of Alice. The July sleepover disclosure and the 29 August 2022 interview statements were the only allegations that had not already come before the trial court. However, it is unclear when the abuse described in the new disclosures purportedly occurred.

Two days later, Father filed a response and motion to Carteret County DSS's juvenile petition. As part of the response and motion, Father argued that

> [p]ursuant to the doctrines of res judicata and collateral estoppel, [the juvenile petition] should be dismissed as [Carteret County DSS] is attempting to relitigate issues existing prior to this [c]ourt's [CCO], as well as the [IPO]. Additionally, this [c]ourt, after hearing arguments of counsel, entered its Temporary Emergency Custody Order . . . [where the trial court] concluded as a matter of law that "The best interest of the minor child would be served by placing her temporary custody in and with [Father] . . . ."

On 19 September 2022, the trial court filed its juvenile petition order (JPO) dismissing Carteret County DSS's juvenile petition with prejudice "pursuant to the doctrines of [r]es [j]udicata and [c]ollateral [e]stoppel." Carteret County DSS appealed the JPO.

The Court of Appeals first determined that the dispute was "most squarely governed by collateral estoppel," rather than res judicata. *In re A.D.H.*, 295 N.C. App. 480, 487 (2024). The court then summarily concluded that, as to both the CCO and the IPO, the requirements under the doctrine of collateral estoppel had been met. *Id.* Thus, the finding that Father had not been shown to abuse Alice contained in the CCO and IPO precluded those same abuse allegations in Carteret County DSS's juvenile petition. *Id.* at 491. However, the Court of Appeals disagreed with the trial court's conclusion that *all* factual allegations contained in the juvenile petition were precluded. *Id.* That ruling, it believed, "was too broad." *Id.* Instead, the Court of Appeals held that the more recent allegations (those made at the July sleepover and during the 29 August 2022 questioning) could not be estopped by the earlier CCO and IPO. *Id.* at 491–92. Therefore, the trial court erred in dismissing the entire juvenile petition. *Id.* at 492. The Court of Appeals then vacated and remanded the case for further proceedings. *Id.* at 494.

Carteret County DSS filed a petition for discretionary review, seeking this Court to review the applicability of collateral estoppel to the CCO and IPO. We allowed review.

## II. Standard of Review

Whether a court is barred from hearing a specific issue under the doctrine of collateral estoppel is a question of law. Questions of law are reviewed de novo. *Philip*

*Morris USA, Inc. v. N.C. Dep't of Revenue*, 386 N.C. 748, 751 (2024). "De novo means fresh or anew; for a second time." *Id.* (extraneities omitted).

### III.    Analysis

The doctrine of collateral estoppel, also referred to as "issue preclusion," is a common law doctrine "developed by the courts of our legal system during their march down the corridors of time." *Thomas M. McInnis & Assocs. v. Hall*, 318 N.C. 421, 427 (1986). The doctrine is designed to "protect[ ] litigants from the burden of relitigating previously decided matters and [to] promot[e] judicial economy by preventing needless litigation." *Id.*

Our precedents articulating the doctrine have hardly been models of clarity. Even still, our Court has consistently observed that the doctrine of collateral estoppel "precludes relitigation of a fact, question or right in issue" when the following requirements are met:

> there has been a final judgment or decree, necessarily determining [the] fact, question or right in issue, rendered by a court of record and of competent jurisdiction, and there is a later suit involving an issue as to the identical fact, question or right theretofore determined, and involving identical parties or parties in privity with a party or parties to the prior suit.

*State v. Summers*, 351 N.C. 620, 622 (2000) (alteration in original) (quoting *King v. Grindstaff*, 284 N.C. 348, 355 (1973)); *see also State ex rel. Tucker v. Frinzi*, 344 N.C. 411, 414 (1996) (stating the same).

From this general rule statement, well-delineated elements have emerged. For

instance, to apply collateral estoppel to particular issues, those issues must: (1) "be the same as those involved in the prior action"; (2) "have been raised and actually litigated in the prior action"; (3) "have been material and relevant to the disposition of the prior action"; and (4) have had a determination in the prior action that was "necessary and essential to the resulting judgment." *Summers*, 351 N.C. at 623.

The difficulty arises in defining the privity requirement. *Id.* ("Unlike issue identity, the rules for determining whether the parties in question are or were in privity with parties in the prior action are not as well defined."). Indeed, privity is "somewhat elusive" as "there is no definition of the word 'privity' which can be applied in all cases." *Id.* (quoting *Hales v. N.C. Ins. Guar. Ass'n*, 337 N.C. 329, 333–34 (1994)) (extraneities omitted). Privity has been generally defined by our Court as "a person so identified in interest with another that he represents the same legal right." *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 36 (2004) (quoting *Tucker*, 344 N.C. at 417). The privity requirement is a constitutionally necessary due process protection. *See Postal Tel. Cable Co. v. Newport*, 247 U.S. 464, 476 (1918) ("The opportunity to be heard is an essential requisite of due process of law in judicial proceedings . . . so [a state] cannot, without disregarding the requirement of due process, give a conclusive effect to a prior judgment against one who is neither a party nor in privity with a party therein."). Privity concerns who can be bound by collateral estoppel; in other words, it identifies the party against whom the doctrine can be asserted.

Closely related to privity is the mutuality requirement. Unlike privity, which

determines who can be *bound* by collateral estoppel, mutuality governs the scope of those entitled to *invoke* the doctrine. As originally understood, the availability of the preclusive effects of a prior judgment had to be mutual between the parties to that prior suit. That is to say, mutuality was satisfied only "if the one taking advantage of the earlier adjudication would have been bound by it, had it gone against him." *Bernhard v. Bank of Am. Nat'l Tr. & Savs. Ass'n*, 122 P.2d 892, 894 (Cal. 1942).[3] Thus, the rule of mutuality "established a pleasing symmetry—a judgment was binding only on parties and persons in privity with them, and a judgment could be invoked only by parties and their privies." 18A *Wright & Miller's Federal Practice and Procedure* § 4463 (3d ed. 2017).

However, this symmetry proved too restrictive. Courts began recognizing that under a strict mutuality requirement, a party "who has had his day in court" would be permitted "to reopen identical issues by merely switching adversaries." *Bernhard*, 122 P.2d at 895. The mutuality requirement was described as "a maxim which one would suppose to have found its way from the gaming-table to the bench." *McInnis*, 318 N.C. at 432 (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 954 (2d Cir. 1964)). In essence, it proved a handy tool for litigants to secure do-overs. As one might expect, it was not long before "the force of the mutuality rule had been diminished by

---

[3] The Supreme Court of California's *Bernhard* opinion is widely acknowledged as "the leading decision abandoning the mutuality requirement." 18A *Wright & Miller's Federal Practice and Procedure* § 4463 (3d ed. 2017); *see also Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 349–50 (1971) (adopting *Bernhard*'s position); *McInnis*, 318 N.C. at 433–34 (adopting *Bernhard*'s position).

exceptions." *Blonder-Tongue Lab'ys*, 402 U.S. at 324. Yet even the exceptions proved inadequate, and soon "[t]he modern trend in both federal and state courts" became "to abandon the requirement of mutuality for collateral estoppel[ ]" altogether. *McInnis*, 318 N.C. at 432.

This Court followed that trend, disposing entirely of the mutuality requirement for the defensive-use of collateral estoppel. *Id.* at 434. In its place, the *McInnis* Court installed the requirement that the party to be collaterally estopped had "a full and fair opportunity to litigate th[e] issue in the [earlier] action." *Id.* *McInnis*, therefore, removed any limitation upon who could defensively invoke collateral estoppel, and installed an additional due process limitation against whom the doctrine could be asserted. The *McInnis* Court's new installment seemingly rested on the simple fact that the mutuality requirement had no persuasive justification, while the privity requirement served weighty due process interests. *See id.* ("[W]e see no good reason for continuing to require mutuality of estoppel in cases like this case."); *see also Bernhard*, 122 P.2d at 895 ("No satisfactory rationalization has been advanced for the requirement of mutuality.").

From this then, it follows that our precedents have developed a defensive-use collateral estoppel doctrine requiring the following: (1) a valid final judgment on the merits in a previous suit; (2) the later suit involves identical issues; (3) the issue was actually litigated in the prior suit and necessary to the judgment; (4) the issue was actually determined; and (5) the party to be collaterally estopped was a party or in

privity with a party to the prior suit, who had a full and fair opportunity to litigate the issue in the earlier action.[4]

Having brought our collateral estoppel doctrine into sharper focus, we turn now to its application in the matter before us. Below, the Court of Appeals believed that the "more meaningful dispute" was "whether collateral estoppel applies in this case given the discrepancy in the standard of review between the CCO and the present litigation." *In re A.D.H.*, 295 N.C. App. at 488. The court then dedicated almost the entirety of its collateral estoppel analysis to this point. In doing so, it glossed over the question of whether the doctrine's requirements were met. After a more detailed examination of the elements, however, we conclude that neither the child custody action nor the interference petition action offers a sufficient basis for the application of collateral estoppel.

**A. The Child Custody Action**

The Court of Appeals reasoned that collateral estoppel applies to the CCO, because "for purposes of privity, we note that both Carteret and Craven County DSS intervened in the custody action." *In re A.D.H.*, 295 N.C. App. at 488. This statement has no basis in the record.

The only parties to the child custody action were Mother and Father. While

---

[4] To reiterate, "there is no definition of the word 'privity' which can be applied in all cases." *Summers*, 351 N.C. at 623 (extraneities omitted). Even still, the general requirements under the doctrine remain constant. In other words, the facts here do not influence our rule statement.

Craven County DSS social workers testified at the hearing, merely serving as a witness does not render one a party to the action. Nor can it be said that Mother and Father represent the interests of Carteret County DSS in any way to establish privity. *Whitacre P'ship*, 358 N.C. at 36 ("In general, privity involves a person so identified in interest with another that he represents the same legal right." (extraneities omitted)). Carteret County DSS's sole interest is in fulfilling its statutory duty to investigate Alice's repeated claims of sexual abuse, to assess her circumstances, and to remove her from the home or provide protective services, if necessary. *See* N.C.G.S. § 7B-302(a) (2023). Indeed, pursuant to this statutory duty, it is not uncommon for the department of social services to take a position entirely at odds with a juvenile's parents. *See, e.g.*, *In re Z.O.M.*, 373 N.C. 87 (2019); *In re D.I.L.*, 380 N.C. 723 (2022).

Accordingly, the Court of Appeals erred in holding that the party to be collaterally estopped (Carteret County DSS) was a party or in privity with a party to the prior child custody action (Mother or Father). The trial court was not collaterally estopped from adjudicating the allegations of sexual abuse because of the CCO.

**B. The Interference Petition Action**

The Court of Appeals summarily concluded, "[f]or present purposes we see no meaningful dispute that both the CCO and IPO . . . contained at least some overlapping factual issues with the present juvenile petition[ ] and were actually litigated and determined." *In re A.D.H.*, 295 N.C. App. at 487. As to the IPO, we

disagree.

All "findings of fact" contained in the IPO regarding the issue of whether Father had abused Alice were not "actually determined" by the trial court. Instead, the trial court merely observed that "*Counsel for [Father] argued* the following to the [c]ourt" before proceeding to list the abuse allegations that Father contended were unsubstantiated. (Emphasis added.) A trial court's recitation of arguments is not a finding of fact. While "[t]here is nothing impermissible about describing testimony," the court still must "ultimately makes its own findings, resolving any material disputes." *In re C.L.C.*, 171 N.C. App. 438, 446 (2005); *see also In re L.C.*, 387 N.C. 475, 482 (2025) ("The Court of Appeals correctly recognized that the trial court is required to 'resolve any material disputes' when making findings of fact." (extraneity omitted)).[5] Here, the trial court failed to make "actually determined" findings of fact regarding the issue of whether Father abused Alice. Accordingly, the recitation of arguments contained in the IPO cannot preclude proper adjudication of the juvenile petition.

## IV. Conclusion

---

[5] We recognize that this Court has provided some leeway for the trial court to properly recite the evidence in its findings of fact without stating whether it found that evidence credible. *In re L.C.*, 387 N.C. at 482. However, such leeway has been limited to "when the recited evidence is a statement against interest." *Id.* (citing N.C.G.S. § 8C-1, Rule 804(b)(3) (2023)). An argument made in support of a party's requested relief is not a statement against interest. Thus, *In re L.C.* has no bearing here.

For these reasons, we hold that the trial court erred in dismissing Carteret County DSS's juvenile petition pursuant to the doctrine of collateral estoppel. Accordingly, we reverse the Court of Appeals' opinion and remand to the trial court for further proceedings on the juvenile petition. We further observe that Carteret County DSS possesses a substantial conflict of interest in this dispute. In light of this conflict, Carteret County DSS's continued participation in this matter is wholly inappropriate.

REVERSED AND REMANDED.

Justice RIGGS concurring.

I concur with the result reached by the majority, and I concur wholeheartedly with the majority's conclusion that Carteret County Department of Social Services' (Carteret County DSS) future involvement in this matter is wholly inappropriate given the obvious conflict the agency has. I write separately to emphasize that the factually dependent nature of the privity inquiry, combined with the extreme and unusual facts in this case, limits the applicability this case has for future cases involving privity in collateral estoppel analyses.

While there are other considerations to the collateral estoppel analysis than just the privity question, the key inquiry on whether the privity requirement of collateral estoppel is met is whether Carteret County DSS is in privity with either the parties in the Child Custody Order (CCO) proceeding or the parties in the Interference Petition Order (IPO). More specifically, the question is whether Carteret County DSS is in privity with either the parents or the Craven County DSS and is therefore precluded from litigating the issues it alleges in its juvenile petition filed on 29 August 2022 because issues raised in the new juvenile petition were previously litigated in the preceding child custody action and interference petition action.

The majority rightly acknowledges that privity does not have a well-defined definition in collateral estoppel analyses, with our prior cases stating that "the meaning of 'privity' for purposes of res judicata and collateral estoppel is somewhat

elusive." *Hales v. N.C. Ins. Guar. Ass'n*, 337 N.C. 329, 333 (1994) (citing *Settle v. Beasley,* 309 N.C. 616, 620 (1983)). The Court of Appeals even acknowledged as much below stating that "[w]e note that the significance of privity as a component of collateral estoppel has been somewhat murky as applied by our Court, with some cases acknowledging privity as an essential element of collateral estoppel . . . and others omitting mention of it altogether." *In re A.D.H.*, 295 N.C. App. 480, 488 n.4 (2024). The Court of Appeals further speculated that "[t]he cause may be that, when our Supreme Court last spoke at length on the topic, it was unclear whether the concept of privity was subsumed into the requirement that 'the party against whom the estoppel is asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding.'" *Id.* (quoting *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 15 (2024)).

Our Court has stated that in determining whether such a privity relation exists, "courts will look beyond the nominal party whose name appears on the record as plaintiff and consider the legal questions raised as they may affect the real party or parties in interest." *State v. Summers*, 351 N.C. 620, 623–24 (2000) (cleaned up). The rationale for applying privity in the collateral estoppel context is that due process requires that persons be given a fair opportunity to litigate their legal rights. *Whitacre P'ship*, 358 N.C. at 36. Due process is not offended when there is a sufficiently close relationship—privity—between the party to a prior action and the party to be estopped in a later action if the prior party had a full and fair opportunity

to litigate the matter to be precluded. *Id.* at 37. Given the unique facts of this case, I would not point to this as a case upon which future litigants should rely upon for clarification of either collateral estoppel law or privity (although both areas of law undoubtedly would be well-served by this Court's guidance in a more useful vehicle of a case).

Turning to the majority's analysis, the majority concludes that collateral estoppel does not apply to issues litigated in the child custody action or issues litigated in the interference petition action. On the factual findings we have in this case, I agree with this outcome, but I think on the topic of privity, these issues are closer calls than the majority's analysis suggests. And that contributes to my hesitance to fully embrace the majority's assertion that this case provides clarity and guidance that future parties should rely upon for the doctrine of collateral estoppel and privity. For example, while I agree that neither of the DSS agencies were parties to the litigation resulting in the CCO, I am troubled by the extent to which the conflict between Carteret County DSS and respondent-mother (Mother) could impact the privity analysis. The fundraising that Mother's aunt, a former Carteret County DSS worker, did for Mother's legal efforts clearly creates a conflict for Carteret County DSS in this matter, *see* majority *supra* n.2 (noting that the Carteret County DSS social worker on the case and other workers were well acquainted with Mother's aunt and her fundraising efforts). But to the extent a former agent of a DSS is funding and directing a parent's effort in a child custody case, that would change the privity

analysis (even if it did not ultimately change the final collateral estoppel conclusion). In my mind, this case comes dangerously close to this hypothetical, and for that reason, this case should not be looked to as one providing clarity on either privity or collateral estoppel. Rather, the majority correct states the law and applies it to extremely unusual—and therefore narrow—circumstances. Therefore, because bad facts make bad law, the majority's application of the doctrine of collateral estoppel and privity here should remain cabined to the unique facts of this case only. *See, e.g.*, *Town of Apex v. Rubin*, 388 N.C. 236, 256 (2025) (Newby, C.J., concurring in part) (acknowledging the legal maxim that "bad cases make bad law" and emphasizing that the case in question was "abnormal" and thus "should not serve as a model for future litigants involved in [similar] disputes").

Similarly, I think the privity question in the interference matter is an even closer call because, at least arguably under our child welfare statutes, Craven County DSS was acting as an agent of Carteret County DSS because Carteret County DSS asked Craven County DSS to take this matter.[1] To be sure, I do not think that any time a county DSS refers a case to another county, that referring county should be collaterally estopped in a different action. But I think we do need to acknowledge

---

[1] Under N.C.G.S. § 7B-302.1, where a conflict exists, the director of the DSS with the conflict "shall request that another county department conduct the assessment" on the reported abuse, neglect, or dependency. Thereafter, the county that accepts the matter "assumes the management of the case." An Act to Make Various Changes to the Laws Affecting Juveniles and Associated Services, S.L. 2025-16, § 1.4(a), https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2025-2026/SL2025-16.pdf.

that this area is more nuanced in practice and we should be careful to allow ourselves the room to consider nuanced facts in difficult cases.

Finally, I agree with the majority that the trial court failed to make affirmative findings of fact and instead merely recited the arguments made by counsel for the Father, and that doing so was an error. *See* majority *supra* Section III.B. But this case is deeply troubling because getting continuity in judges overseeing these cases and our deference to the trial court judges who are closer to the facts can often serve to prevent the weaponization of false child abuse allegations, and that ultimately protects children, too. It bears noting that the same district court judge, the Honorable W. David McFadyen III, presided over both the permanent child custody hearing, which spanned multiple days, and the interference petition hearing. Thus, Judge McFadyen was therefore familiar with the parties and the history of the case. And it further bears noting that the interference petition action dealt with many of the facts that were litigated and determined at the child custody hearing. This includes, among other parallels, that the allegations underlying the interference petition were made to the same school counselor who Alice allegedly made allegations to prior to the custody hearing that were eventually dismissed and found to be unsubstantiated after two DSS investigations. Accordingly, while the majority only points to the deficiencies in the trial court's finding of facts in the IPO to conclude that the IPO cannot preclude proper adjudication of the juvenile petition, the issue becomes a closer one when examining the whole procedural history of the dispute.

Again, I do agree with the outcome that the Court reaches, and I think the majority's clear admonishment on conflicts is well stated and important for the integrity of the child welfare system. This case, however, should be viewed as an instance where the Court is applying the law to narrow circumstances and thus has limited applicability for future litigants. This is a complex child custody case interwoven with multiple unsubstantiated allegations of child abuse and very troubling findings of a mother coaching a child (and the child being subjected then to likely unnecessary physical and psychological examinations). Further, the transfer of the case to another county due to a conflict of interest and multiple unsubstantiated DSS investigations contribute to the substantial list of tragic facts. To conclude, the question of privity in collateral estoppel cases will likely arise again under a case providing this Court with a more meaningful opportunity, with broader reaching facts than the unique facts presented in this case, to clarify this area of the law.