IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-482

Filed 6 May 2026

Henderson County, No. 04CVS000103-440

STEVEN WAYNE COLLAR, and PAMELA MAE COLLAR, Plaintiffs,

v.

FLETCHER HOSPITAL, INC. aka PARK RIDGE HOSPITAL, ADVENTIST HEALTH SYSTEM and ADVENTIST HEALTH SYSTEM SUNBELT HEALTHCARE CORPORATION, Defendants.

Appeal by Defendants from order entered 19 November 2024 by Judge Forrest Donald Bridges in Henderson County Superior Court. Heard in the Court of Appeals 14 January 2026.

> *Law Offices of Wade E. Byrd, P.A., by Wade E. Byrd and Edwards Kirby, LLP, by David F. Kirby, for Plaintiffs-Appellees.*
>
> *Roberts & Stevens, PA, by David Hawisher, Phillip Jackson, Charles McGee, and Denise Lockett, for Defendants-Appellants.*
>
> *Cranfill Sumner LLP, by Steven A. Bader, for amici North Carolina Association of Defense Attorneys.*

GRIFFIN, Judge.

Defendants Park Ridge Hospital and Adventist Health appeal from the trial court's order entered on 19 November 2024 denying Defendants' motion for summary judgment, arguing Plaintiffs are in privity with the plaintiffs in *Justus v. Rosner*, No. 03CVS000977-440 (N.C. Super. Ct. Sept. 25, 2014), and precluded by collateral estoppel from relitigating the issues in *Justus*. Defendants also submit a petition for

writ of certiorari asking the Court to hear their argument that negligent credentialing is a derivative claim requiring a viable underlying claim against a physician, entitling Plaintiffs to summary judgment on the negligent credentialing claim because Defendants dismissed their claims against Dr. Rosner. Plaintiffs submit an additional issue, arguing the trial court erred in holding that judicial estoppel cannot preclude Defendants from invoking collateral estoppel. We affirm in part, reverse and remand in part, and dismiss the PWC.

## I. Factual and Procedural Background

This case and associated cases center on Dr. Michael Rosner's diagnostic approach to cervical stenosis and Chiari malformation, which are treated by decompression surgeries—cervical laminectomy and suboccipital craniectomy. Dr. Rosner engaged in what Plaintiffs allege to be "experimentation" and "experimental" medical practices and surgeries. In 1999, Dr. Michael Rosner contacted Defendant Park Ridge to receive medical staff privileges for decompression surgeries at Defendant Park Ridge's facilities, which he was granted in September 1999. At that time, Dr. Rosner had full and unrestricted privileges at Presbyterian Hospital in Charlotte, including privileges to perform cervical laminectomies and suboccipital decompression. As part of his credentialing application to Defendant Park Ridge, Dr. Rosner requested privileges for decompression surgeries and disclosed the medical disagreement with his views. While certain portions of the credentialing process were privileged, the credentialing committee investigated Dr. Rosner's experience,

including his experience at his former medical workplaces. Dr. Rosner was granted credentials provisionally for one year, during which he was under a "fairly exhaustive monitoring process" by Defendant Park Ridge. In 2000, after this provisional period, Dr. Rosner applied for and was granted reappointment for his clinical privileges at Defendant Park Ridge. Throughout Dr. Rosner's time with privileges at Defendant Park Ridge, he never was an employee, solely a member of the medical staff.

In 2002, the North Carolina Medical Board summarily suspended Dr. Rosner's medical license based on concerns he performed unnecessary surgeries. In 2003, after determining Dr. Rosner had performed unnecessary surgeries, the Medical Board indefinitely suspended his medical license. Shortly thereafter, several lawsuits were filed against Dr. Rosner and Defendants, alleging Dr. Rosner negligently or fraudulently diagnosed the plaintiffs with Chiari malformation or cervical stenosis; recommended and performed experimental procedures that were "medically unnecessary or inappropriate" and fraudulent; and the plaintiffs were injured from these unnecessary surgeries. The plaintiffs alleged Defendant Park Ridge was negligent in its credentialing and monitoring of Dr. Rosner.

In 2006, a group of the plaintiffs in the suits against Dr. Rosner and Defendants—including the Justuses and Collars—signed a memorandum of understanding, creating a plaintiffs' trust fund, which stated in part,

> We understand that currently there are numerous lawsuits pending against Dr. Michael Rosner, filed by several different attorneys.

> We understand that, in order to reduce the cost of litigation in these cases and with the hope of expediting resolution of these cases, our attorneys have recommended that we seek a [c]ourt order staying all but a few of these cases, and allowing those few to be tried first.
>
> We understand that our attorneys, working with other attorneys representing other [p]laintiffs in cases pending against Dr. Rosner, will recommend to the [c]ourt certain cases to go to trial first and that our case may or may not be one of those recommended to be tried first.
>
> We understand that Dr. Rosner may have limited malpractice insurance coverage and that a judgment against Dr. Rosner may, at some point, become unrecoverable.
>
> We understand and agree that any award received by us, or by other [p]laintiffs in this litigation, will be placed in a Trust Fund and will be subsequently divided among some or all of the [p]laintiffs based upon the decision of one or more arbitrators.
>
> We agree to enter into an arbitration agreement at a later date, which will allow for implementation of the process described in the preceding paragraph.

Based on this memorandum, Plaintiff Mr. Collar testified during deposition as to the following:

> Q [MS. GRANT]. Now, Ms. Justice[1] -- during her case, Ms. Justice had signed a stipulation that if there was any judgment in the case, it was going to go into an account, and the plaintiffs in the Rosner cases would later would have an arbitration or some type of proceeding to address or allocate that money.

---

[1] This appears to be a misspelling of Pamela Justus, the plaintiff in the relevant associated litigation *Justus*.

First let me ask you, were you in agreement with that plan of any money that was awarded to any of the plaintiffs who sue Dr. Rosner, that it be placed in the account and shared with other plaintiffs in the Rosner cases?

A. [MR. COLLAR]. My understanding was there would be three. When that is done, you will decide we best pay them, or we're going to have to pay a lot and you will settle, or the [c]ourt will assign based on the three, because we're setting trend of bringing truth out, you know.

Q. Okay.

A. So I'm expect that when that is finished, the three, after arbitration, that there would be some allotment. Not any understanding of Pam Justice. I somehow thought of her as totally separate deal. Not relating to -- it may be, but in my mind there was no connection to money and me and money. It was them getting husband money.

Q. So when you understood there were three cases, did you understand that there were three other cases that were selected, Ms. Justice --

A. Yeah.

Q. -- a Ms. Gillespie –

A. Yes.

Q. -- and another case?

A. There was three.

. . . .

Q. And so were you ever aware of a stipulation that she had signed in her case that any money she recovered would have went into this account that would have then proceeded to arbitration or been shared among the --

A. No knowledge of this.

MR. BYRD: What? What was your answer?

[MR. COLLAR]: I don't know about money from her coming to me. I thought it'd go to him.

MR. BYRD: Let me ask you this, Steven: Did you sign an agreement like all the other clients of mine –

MS. GRANT: Uh-huh.

MR. BYRD: -- that if there were any recovery, it would go into a pool, and it would be decided by an independent neutral arbitrator as to how?

[MR. COLLAR]: I understand that, except any recovery. I was thinking it would be big three and the whole thing decide yes or no. Not her decision. But when this three is done, then arbitration and then we would get or not. And I signed that, yeah. That's what I am expecting.

MR. BYRD: Right.

[MR. COLLAR]: I did not connect Pam to that for some reason. I don't know why.

BY MS. GRANT:

Q. Okay.

A. It makes sense. Was that one of the three?

MR. BYRD: Yes.

In response to the filing of the various lawsuits against Dr. Rosner and Defendants, Chief Justice Sarah Parker designated "34 cases involving [the] defendant Michael J. Rosner exceptional pursuant to Rule 2.1 of the General Rules

of Practice," assigning them to Judge Zoro Guice on 10 October 2006. On 7 June 2007, Judge Guice stayed 31 of the 34 cases, except *Justus* and two other cases.

In 2014, *Justus* became the first, and as of this date only, Rosner lawsuit to come to trial. There, the plaintiff Pamela Justus suffered from severe headaches, which made her "suicidal," as well as severe "neck pain, axial pain[,] left upper extremity numbness, weakness in both arms[,] legs and urinary urgency, incontinence and intermittent hesitancy; imbalance and diarrhea alternating with constipation." She became a patient of Dr. Rosner in 2000 and 2001, who performed a laminectomy on Ms. Justus in 2000 and a suboccipital craniectomy in 2001, after which Ms. Justus initially reported improvements in her condition but later reported worsening in her condition. Among the claims alleged by the plaintiffs in *Justus* were the following:

> FOURTH CLAIM FOR RELIEF
> (AGAINST PARK RIDGE HOSPITAL, ADVENTIST
> and ADVENTIST SUNBELT: NEGLIGENCE)
>
> 34. Plaintiffs allege and incorporate herein the allegations contained in paragraphs 1 through 33.
>
> 35. PARK RIDGE HOSPITAL, ADVENTIST and ADVENTIST SUNBELT owed a duty to MRS. JUSTUS to exercise reasonable care and diligence arid to comply with the standards of practice among healthcare facilities situated in Henderson County, North Carolina, or in similar communities, in 2000-2001.
>
> 36. PARK RIDGE HOSPITAL, ADVENTIST and ADVENTIST SUNBELT breached their duties to [the p]laintiffs in the following respects:

(a) Failing to conduct appropriate background information checks and other investigations into the past performance of DR. ROSNER at other medical facilities;

(b) Failing to closely monitor DR. ROSNER's performance during his initial probationary privileging period;

(c) Failing to evaluate the medical necessity of the procedures performed by DR. ROSNER;

(d) Failing to place into effect quality monitoring activities to review the appropriateness of the surgical procedures performed by DR. ROSNER; and

(e) Failing to investigate or to take action when it became known that excessive numbers of surgeries to correct a rare congenital anomaly were being performed by DR. ROSNER.

37. As a direct and proximate result of the negligence of [the d]efendant[s] PARK RIDGE HOSPITAL, ADVENTIST and ADVENTIST SUNBELT, [the p]laintiffs have been damaged as herein alleged.

After a lengthy trial in which the jury was instructed, in relevant part, in order to find Defendant Park Ridge negligent in that case for Ms. Justus's injury and death, the jury had to find Defendant Park Ridge "was negligent in one or more of the following ways:"

1. Failed to contact practicing Neurosurgeons who are or were familiar with Dr. Rosner's practice during Dr. Rosner's credentialing and re-credentialing process other than those listed by Dr. Rosner;

2. Failed to adequately investigate and review prior lawsuits against Dr. Rosner at the University of Alabama;

3. Failed to adequately investigate and review Dr. Rosner's problems and to investigate the reasons for leaving the UAB;

4. Failed to adequately investigate Dr. Rosner's reasons for leaving Charlotte, NC;

5. Failed to adequately investigate why Dr. Rosner was denied privileges at certain Charlotte, North Carolina hospitals;

6. Failed to put in place an institutional review board;

7. Failed to adequately monitor Dr. Rosner by employing the services of an independent neurosurgeon;

8. Failed to follow its policies and procedures with respect to Dr. Rosner and his treatment of his patients prior to performing services by insuring that Dr. Rosner complied with or followed the policies of the hospital when the services rendered by Dr. Rosner were experimental;

9. Failed to have adequate safeguards in place to protect Park Ridge Hospital patients from unnecessary surgeries performed by Dr. Rosner;

10. Failed to have an adequate peer review;

11. Conspired with Dr. Rosner to perform medically unnecessary surgeries at Park Ridge Hospital for financial profit;

12. Fraudulently abused their position of trust within the community promoting controversial and/or experimental surgeries by Dr. Rosner at Park Ridge Hospital; and,

13. Marketed Dr. Rosner's surgical procedures without monitoring the same.

The jury found Dr. Rosner negligent, but regarding Defendant

Park Ridge, it delivered the following verdict, in relevant part:

> 2. Was Pamela Justus injured by the negligence of the defendant Fletcher Hospital, Incorporated, d/b/a Park Ridge Hospital? (Answer "YES" or "NO" in the space provided below.)
>
> ANSWER: <u>No</u>
>
> . . . .
>
> 4. Was the death of Pamela Justus caused by the negligence of the defendant Fletcher Hospital, Incorporated, d/b/a Park Ridge Hospital? (Answer "YES" or "NO" in the space provided below.)
>
> ANSWER: <u>No</u>

On 13 June 2015, Plaintiffs filed a motion to remove the stay on the 33 cases against Defendants, and to proceed to trial with three cases, including this case, stating,

> i. [Plaintiffs' counsel] is lead counsel for all Plaintiffs herein and is authorized by them and their attorneys to take such action as in his discretion is in the best interests of Plaintiffs' group as a whole;
>
> ii. Discovery in these cases has already occurred and need not commence anew;
>
> iii. All parties have the right to a clean pathway to resolution of all cases and some order must prevail;
>
> iv. The premise of all these cases is that Dr. Rosner performed unnecessary surgery on all these patients, failed to obtain their informed consent to the experimental and controversial nature of the surgery, and that [D]efendants knew or should have known of the experimental and controversial nature of these surgical procedures yet failed

to use reasonable care and diligence in protecting the patients' safety;

v. In almost all of these cases, the allegation of wrongdoing against both [D]efendants arose in a 2-3 year period (2000-02);

vi. Given the similarities among these cases and the narrow time periods involved, an order that the foregoing three cases proceed to trial in the sequence requested will allow an efficient disposition of these cases such that no party is prejudiced thereby.

The trial court lifted the stay as to the three cases, including this case.

On 14 August 2015, regarding 25 other cases in the Rosner litigation after

*Justus*, Plaintiffs requested the trial court

consolidate the preceding cases for the purpose of pretrial discovery, motions, and a separate trial against [] Defendants, limited to the following issues: (1) whether the surgeries performed on Plaintiffs by Dr. Rosner were experimental; (2) whether [] Defendants knew, or should have known, the experimental status of these surgeries; and (3) if so, (a) whether [Defendants] allowed, condoned and promoted to the general public surgery which was experimental, (b) Failed to utilize the functions for patient safety of an Institutional Review Board, (c) failed to employ the services of an independent neurosurgeon to oversee the surgeries Dr. Rosner was performing, and (d) whether [] Defendants adequately disclosed to Plaintiffs the experimental status of these surgeries.

In their motion, Plaintiffs argued "the same issues recur in all cases. The legal issue is identical since [] Defendants owed the same duty to all [the p]laintiffs." Plaintiffs continued,

Factually too the pertinent circumstances are, for all

practical purposes, the same: with minor variations, the same procedure was used; and, despite Plaintiffs' differing medical conditions, the salient fact remains that the procedure was experimental in every instance. Given this overwhelming commonality of relevant circumstances, it is hardly surprising that, if separate trials are conducted, the same experts will testify, again and again, offering essentially the same opinions on essentially the same issues.

Defendants opposed the motion to consolidate, arguing, "in the alternative to the position of [Defendants]" for the application of *res judicata*/collateral estoppel for the claims against them, it was not a settled fact in the Rosner cases that Dr. Rosner's surgeries on each patient were "experimental." The trial court denied the motion to consolidate on 23 February 2016.

On 4 August 2017, Chief Justice Mark Martin assigned the Rosner cases to Judge Forrest Bridges in lieu of Judge Zoro Guice.

In the case on appeal, Plaintiffs filed their complaint on 16 January 2004, alleging Mr. Collar suffered "dizziness, changes in speech, decreased memory, pain, and fatigue . . . from daily headaches, which were located suboccipitally and spread down into his neck." Dr. Rosner recommended Plaintiff Mr. Collar undergo "a suboccipital craniectomy, subpial resection of cerebellar tonsils, and cervical laminectomy through C7;" "relying upon Dr. Rosner's expertise and representations, Mr. Collar consented to the procedures." Plaintiffs allege after the surgeries Plaintiff Mr. Collar experienced significant deteriorating conditions. Ultimately, Plaintiffs allege,

[t]he unnecessary surgery performed by Dr. Rosner upon Mr. Collar on November 2, 2001, damaged Mr. Collar to the extent that he suffers continuous, severe pain. Mr. Collar suffered damage to his equilibrium, necessitating the use of a cane or a wheelchair at all times to prevent falling. He is unable to drive a car. He suffers from memory and cognitive loss. Mr. Collar is unable to return to work. He is unable to perform many formerly routine tasks. He is unable to interact socially with friends and family.

Based on these allegations, Plaintiffs asserted the following claims against Defendants:

### FOURTH CLAIM FOR RELIEF
(Against PARK RIDGE HOSPITAL for Negligence)

39. Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 38.

40. The agents and employees of [D]efendant PARK RIDGE HOSPITAL owed [] Plaintiffs a duty to make reasonable effort to monitor and oversee the treatment prescribed and administered by the physicians at their facility and to make reasonable efforts to ensure the competency of the physicians practicing at their facility.

41. The agents and employees of [D]efendant PARK RIDGE HOSPITAL breached this duty to [] Plaintiffs in the following respects:

(a) Failing to conduct appropriate background information checks and other investigations into the past performance of DR. ROSNER at other medical facilities;

(b) Failing to closely monitor DR. ROSNER's performance during his initial probationary privileging period;

(c) Failing to evaluate the medical necessity of the procedures performed by DR. ROSNER;

(d) Failing to place into effect quality monitoring activities to review the appropriateness of the surgical procedures performed by DR. ROSNER; and

(e) Failing to investigate or to take action when it became known that excessive numbers of surgeries to correct a rare congenital anomaly were being performed by DR. ROSNER.

42. As a direct and proximate result of the negligence of Defendant PARK RIDGE HOSPITAL, MR. COLLAR has sustained, and will sustain in the future, medical expenses, loss of earnings, pain and suffering, scars and disfigurement, loss of use of part of the body, and permanent injury.

43. The officers, directors, or managers of [D]efendant PARK RIDGE HOSPITAL participated in or condoned the acts and omissions described hereinabove. These acts and omissions were fraudulent, willful and wanton. [] Plaintiff is entitled to punitive damages against [D]efendant PARK RIDGE HOSPITAL.

FIFTH CLAIM FOR RELIEF
(Against [D]efendant ADVENTIST SUNBELT for Negligence)

44. [] Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 43.

45. At all times relevant hereto, [D]efendant ADVENTIST SUNBELT was the sole member of [D]efendant PARK RIDGE HOSPITAL, with full right to control the method and manner in which [D]efendant PARK RIDGE HOSPITAL operated. Defendant ADVENTIST SUNBELT is liable, under the doctrine of *respondeat superior*, for the negligence of the agents and employees of [D]efendant PARK RIDGE HOSPITAL. Alternatively, [D]efendants PARK RIDGE HOSPITAL and ADVENTIST SUNBELT were engaged in a joint venture, in pursuit of a common purpose, and the negligence of the agents and employees of

[D]efendant PARK RIDGE HOSPITAL is imputed to [D]efendant ADVENTIST SUNBELT.

46. As a direct and proximate result of the negligence of [D]efendant ADVENTIST SUNBELT, as imputed to it by the negligence of [D]efendant PARK RIDGE HOSPITAL, MR. COLLAR has sustained, and will sustain in the future, medical expenses, loss of earnings, pain and suffering, scars and disfigurement, loss of use of part of the body, and permanent injury.

47. The officers, directors, or managers of [D]efendant ADVENTIST SUNBELT participated in or condoned the acts and omissions described in paragraphs 24 and 41 hereinabove. These acts and omissions were fraudulent, willful and wanton. [] Plaintiff[s are] entitled to punitive damages against [D]efendant ADVENTIST SUNBELT.

. . . .

SEVENTH CLAIM FOR RELIEF
(Against [D]efendant ADVENTIST for Negligence)

52. [] Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 51.

53. At all times relevant hereto, [D]efendant ADVENTIST owned and/or operated [D]efendants PARK RIDGE HOSPITAL and/or ADVENTIST SUNBELT. Defendant ADVENTIST is liable, under the doctrine of *respondeat superior*, for the negligence of the agents and employees of [D]efendants PARK RIDGE HOSPITAL and/or ADVENTIST SUNBELT. Alternatively, [D]efendants ADVENTIST and PARK RIDGE HOSPITAL or ADVENTIST SUNBELT were engaged in a joint venture, in pursuit of a common purpose, and the negligence of the agents and employees of [D]efendants PARK RIDGE HOSPITAL and ADVENTIST SUNBELT is imputed to [D]efendant ADVENTIST.

54. As a direct and proximate result of the negligence of

[D]efendant ADVENTIST, as imputed to it by the negligence of [D]efendants PARK RIDGE HOSPITAL and/or ADVENTIST SUNBELT, MR. COLLAR has sustained, and will sustain in the future, medical expenses, loss of earnings, pain and suffering, scars and disfigurement, loss of use of part of the body, and permanent injury.

55. The officers, directors, or managers of [D]efendant ADVENTIST participated in or condoned the acts and omissions described in paragraphs 24 and 41 hereinabove. These acts and omissions were fraudulent, willful and wanton. [] Plaintiff is entitled to punitive damages against [D]efendant ADVENTIST.

EIGHTH CLAIM FOR RELIEF
(Against all Defendants for Loss of Consortium)

56. [] Plaintiffs reallege and incorporate herein the allegations contained in paragraphs 1 through 55.

57. As a direct and proximate result of [] Defendants' negligence, MRS. COLLAR has lost the marital services, society, affection, companionship and sexual relations of her spouse, MR. COLLAR.

Plaintiffs voluntarily dismissed their claims against Dr. Rosner without prejudice on 25 May 2016, and Defendants filed their answer on 7 January 2020. On 29 November 2023, Defendants filed their amended motion for summary judgment on appeal here, which the trial court heard argument on 17 September 2024. On 19 November 2024, the trial court issued its order denying Defendants' motion for summary judgment. Defendants filed their notice of appeal on 13 December 2024.

## II.    Analysis

Defendants argue the trial court erred in denying their motion for summary

judgment because Plaintiffs are in privity with the plaintiffs in *Justus* and precluded by collateral estoppel from relitigating the issues in *Justus*. Defendants also submit a petition for writ of certiorari arguing negligent credentialing is a derivative claim requiring a viable underlying claim against a physician. Plaintiffs submit an additional issue, arguing the trial court erred in holding that judicial estoppel cannot preclude Defendants from invoking collateral estoppel. We affirm the trial court's denial of judicial estoppel, reverse the trial court's denial of Defendants' motion for summary judgment and remand with instruction to grant Defendants' motion for summary judgment, and dismiss Defendants' PWC as moot.

As this is an appeal of an interlocutory order, we must determine if we have jurisdiction over this appeal before we review the issues presented. "Generally, there is no right of immediate appeal from interlocutory orders and judgments," *Goldston v. Am. Motors Corp.*, 326 N.C. 723, 725, 392 S.E.2d 735, 736 (1990), but "immediate review is available where the order affects a substantial right," *Smith v. Polsky*, 251 N.C. App. 589, 594, 796 S.E.2d 354, 358 (2017); *see* N.C. Gen. Stat. § 1-277(a) (2025); N.C. Gen. Stat. § 7A-27(b)(3)(a) (2025). "An interlocutory appeal of the 'denial of a motion to dismiss premised on . . . collateral estoppel does not *automatically* affect a substantial right; the burden is on the party seeking review of the interlocutory order to show how it will affect a substantial right absent immediate review.'" *Bartels v. Franklin Operations, LLC*, 288 N.C. App. 193, 195–96, 885 S.E.2d 357, 359 (2023)

(emphasis in original) (quoting *Whitehurst Inv. Props., LLC v. NewBridge Bank*, 237 N.C. App. 92, 95, 764 S.E.2d 487, 489 (2014)).

Defendants argue this Court has jurisdiction due to the risk of an inconsistent verdict. "[T]o meet its burden of showing how a substantial right would be lost without immediate review, the appealing party must show that (1) the same factual issues would be present in both trials and (2) the possibility of inconsistent verdicts on those issues exists." *Whitehurst*, 237 N.C. App. at 96, 764 S.E.2d at 490. "A risk of inconsistent verdicts means that there is 'a risk that different fact-finders would reach irreconcilable results when examining the same factual issues a second time.'" *Capitol City Homes, LLC v. Starlight Homes N.C., L.L.C.*, --- N.C. App. ---, ---, 924 S.E.2d 59, 63 (2025) (quoting *Denney v. Wardson Constr., Inc.*, 264 N.C. App. 15, 19, 824 S.E.2d 436, 439 (2019)).

Here, as discussed further below, Defendants' alleged negligence in this action is the same issue litigated and decided in the *Justus* litigation, supported by the same evidence; thus, should the case on appeal proceed to trial, the verdict would raise "the possibility of inconsistent verdicts on those issues," *Whitehurst*, 237 N.C. App. at 96, 764 S.E.2d at 490, as the jury in *Justus* determined Defendant Park Ridge not to be negligent with respect to its dealings with Dr. Rosner. Therefore, Defendants meet their burden for this Court to hear the appeal.

Further, as an appeal from the denial of a motion for summary judgment, we determine if summary judgment is appropriate by evaluating if "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Forbis v. Neal*, 361 N.C. 519, 523–24, 649 S.E.2d 382, 385 (2007) (quoting N.C. R. Civ. P. 56(c)). "The trial court may not resolve issues of fact and must deny the motion if there is a genuine issue as to any material fact." *Id.* at 524, 649 S.E.2d at 385 (citing *Singleton v. Stewart,* 280 N.C. 460, 464, 186 S.E.2d 400, 403 (1972)). "An issue is genuine if it 'may be maintained by substantial evidence[,]'" *Bartley v. City of High Point*, 381 N.C. 287, 292, 873 S.E.2d 525, 531 (2022) (quoting *City of Thomasville v. Lease-Afex, Inc.*, 300 N.C. 651, 654, 268 S.E.2d 190 (1980)), and "[a]n issue is material if, as alleged, facts 'would constitute a legal defense, or would affect the result of the action or if its resolution would prevent the party against whom it is resolved from prevailing in the action,'" *Id.* at 292, 873 S.E.2d at 531 (quoting *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518, 186 S.E.2d 897, 901 (1972)). "Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion." *Id.* at 292, 873 S.E.2d at 531 (citing *State v. Mann*, 355 N.C. 294, 301, 560 S.E.2d 776 (2002)). We review summary judgment de novo, *Forbis*, 361 N.C. at 524, 649 S.E.2d at 385, but review the denial of judicial estoppel for abuse of discretion, *Old Republic Nat'l Title Ins. Co. v. Hartford Fire Ins. Co.*, 369 N.C. 500, 507, 797 S.E.2d 264, 269 (2017).

**A. Privity**

First, Defendants argue Plaintiffs "are bound by the verdict of *Justus*, both because they were privy to that action and because the '*Lassiter* exception' to privity applies." We agree the Collars were in privity with the Justuses.

"Under . . . collateral estoppel (or 'issue preclusion'), 'parties and parties in privity with them—even in unrelated causes of action—are precluded from retrying fully litigated issues that were decided in any prior determination [between the parties or their privies] and were necessary to the prior determination.'" *Hales v. N.C. Ins. Guar. Ass'n,* 337 N.C. 329, 333, 445 S.E.2d 590, 594 (1994) (alteration in original) (quoting *King v. Grindstaff,* 284 N.C. 348, 356, 200 S.E.2d 799, 805 (1973)). Our Supreme Court has characterized the definition of privity as "somewhat elusive," stating "[t]here is no definition of the word 'privity' which can be applied in all cases." *Hales,* 337 N.C. at 333–34, 445 S.E.2d at 594 (quoting *Masters v. Dunstan,* 256 N.C. 520, 524, 124 S.E.2d 574, 577 (1962)). However, our Supreme Court noted, "[t]he prevailing definition that has emerged from our cases is that 'privity' for purposes of *res judicata* and collateral estoppel 'denotes a mutual or successive relationship to the same rights of property.'" *Hales*, 337 N.C. at 334, 445 S.E.2d at 594 (quoting *Settle v. Beasley,* 309 N.C. 616, 620, 308 S.E.2d 288, 290 (1983)). Stated otherwise, "[i]n general, 'privity involves a person so identified in interest with another that he represents the same legal right.'" *Funderburk v. Cont'l Tire the Ams.*, 300 N.C. App. 353, 371, 921 S.E.2d 823, 837 (2025) (quoting *State ex rel. Tucker v. Frinzi*, 344 N.C. 411, 417, 474 S.E.2d 127, 130 (1996)).

"To be in privity, the interests of two parties must be so intertwined that the estopped party 'was fully protected in the first trial' because his 'interest has been legally represented.'" *Id.* at 371, 921 S.E.2d at 837 (quoting *Cnty. of Rutherford ex rel. Hedrick v. Whitener*, 100 N.C. App. 70, 76, 394 S.E.2d 263, 266 (1990)). "[P]rivity also exists where one not actually a party to the previous action controlled the prior litigation and had a proprietary interest in the judgment or in the determination of a question of law or facts on the same subject matter." *Cline v. McCullen*, 148 N.C. App. 147, 150, 557 S.E.2d 588, 591 (2001) (citing *Thompson v. Lassiter,* 246 N.C. 34, 39, 97 S.E.2d 492, 496 (1957)). Of course, "[p]rivity requires 'absolute identity of interest,' and cannot be established 'from the mere fact that persons may happen to be interested in the same question or in proving or disproving the same set of facts, or because the question litigated was one which might affect such other person's liability as a judicial precedent in a subsequent action." *Funderburk*, 300 N.C. App. at 371, 921 S.E.2d at 837 (internal citations omitted). In other words, "whether the privity be one of estate, contract, blood, or law, it has no personal basis as a mere matter of sentiment, but rests on some actual mutual or successive relationship to the same right of property." *Masters*, 256 N.C. at 525, 124 S.E.2d at 577 (quoting 72 C.J.S. *Privities*, 956–958).

Defendants rely primarily on this Court's opinion in *Cline v. McCullen*. There, a bond runner received a fifty percent commission on all bonds written by a bail bondsman. *Cline*, 148 N.C. App. at 150, 557 S.E.2d at 591. After the Clerk of Court

in Sampson County "instructed the Sampson County Magistrate's Office to suspend [the bond runner's] ability to write bonds in Sampson County" for pending criminal charges, the bond runner sued the Clerk of Court after the relevant charges were dismissed. *Id.* at 148, 557 S.E.2d at 589. The bond runner's suit was dismissed because the trial court found the bail bondsman "was in privity with [the bond runner] under the doctrines of *res judicata* and collateral estoppel." *Id.* at 148–49, 557 S.E.2d at 590. On appeal, this Court affirmed the trial court offering the following reasoning, in relevant part, for its holding,

> In the case *sub judice,* [the bail runner] was a bond runner for [the bail bondsman] and received a fifty percent commission on all bonds written by him in Sampson County. As a bond runner, [he] "execute[ed] bonds on behalf of the licensed bondsman when the power of attorney has been duly recorded." N.C. Gen. Stat. § 58–71–1(9) (1999). [The bail runner]'s rights to his commission were granted to him based on the power of attorney he received from [the bail bondsman]. Therefore, in [the bail runner]'s earlier lawsuit against [the Clerk of Court], he was in essence suing for the lost profits of [the bail bondsman] from whom he derived his commission. *This successive or mutual relationship in the same rights in property establishes that the interests of both [the bail runner] and [the bail bondsman] are so intertwined that privity exists between them.*

*Id.* at 150, 557 S.E.2d at 591 (citation modified).

Likewise, here, Plaintiffs and the Justuses, are both, at present, in a "successive or mutual relationship in the same rights in property," *see id.* at 150, 557 S.E.2d at 591, because they each signed the memorandum stating, "[w]e understand

and agree that any award received by us, or by other [p]laintiffs in this litigation, will be placed in a Trust Fund and will be subsequently divided among some or all of the [p]laintiffs based upon the decision of one or more arbitrators." This division by the arbitrators has not yet happened for the following paragraph of the memorandum says, "[w]e agree to enter into an arbitration agreement at a later date, which will allow for implementation of the process described in the preceding paragraph." Thus, until an arbitrator determines otherwise per the memorandum each plaintiff signed, Plaintiffs and the Justuses, would have the same legal right to the trust fund. *See* Right, Black's Law Dictionary (12th ed. 2024) (defining a "legal right" as, "[a] right created or recognized by law" and defining "property right" as "[a] right to specific property, whether tangible or intangible"). Plaintiff Mr. Collar expressed his knowledge of this arrangement, stating in his deposition, "[b]ut when this three is done, then arbitration and then we would get or not," indicating Plaintiff's awareness his legal right was fully protected and represented in *Justus* as well as the reality the legal right to the money in the trust may be modified once the litigation surrounding Dr. Rosner concluded.

Therefore, when Plaintiffs and the Justuses entered into a legally binding memorandum establishing a trust fund for the purposes of the Rosner litigation, agreeing to share a right as beneficiaries of each other's potential damages, only to be potentially modified by arbitrators, their interests created "a mutual or successive relationship to the same rights of property," *see Hales*, 337 N.C. at 334, 445 S.E.2d at

594, so intertwined with each other that they represent the same legal right, making them parties in interest.[2]

The trial court heavily premised its decision to deny summary judgment on *Carolina Power & Light Co. v. Merrimack Mut. Fire Ins. Co.*, 238 N.C. 679, 79 S.E.2d 167 (1953).[3] In *Merrimack*, the owner of a warehouse destroyed by a fire brought an initial action alleging negligence against Carolina Power & Light, and a jury found Carolina Power & Light not to be negligent. *Merrimack,* 238 N.C. at 682, 79 S.E.2d at 168. At the same time as this initial suit, "20 separate actions for loss of property in the same fire were instituted against [Carolina Power & Light]" with the claimants alleging damages to their properties due to negligence by Carolina Power & Light. *Id.* at 682, 79 S.E.2d at 168–69. The claimants had "substantially the same allegations of negligence against" Carolina Power & Light and "in each of these actions was joined one of the insurers of that particular property" with many

---

[2] *See King*, 284 N.C. at 357, 200 S.E.2d at 806 (holding statutory beneficiaries of wrongful death suits were subject to collateral estoppel as parties in interest, despite not being named plaintiffs, because "[t]he courts will look beyond the nominal party whose name appears on the record as [the] plaintiff and consider the legal questions raised as they may affect the real party or parties in interest" (quoting *Davenport v. Patrick*, 227 N.C. 686, 688, 44 S.E.2d 203, 205 (1947))); *Settle*, 309 N.C. at 620, 308 S.E.2d at 290 (stating a "concurrent relationship to the same right . . . may exist between guardian and ward or trustee and beneficiary" for privity); *Cline*, 148 N.C. App. at 150, 557 S.E.2d at 591 ("This successive or mutual relationship in the same rights in property establishes that the interests of both [the bond runner] and [the bail bondsman] are so intertwined that privity exists between them."); *see also Funderburk*, 300 N.C. App. at 371, 921 S.E.2d at 837 ("In general, 'privity involves a person so identified in interest with another that he represents the same legal right.'" (quoting *Frinzi*, 344 N.C. at 417, 474 S.E.2d at 130)).

[3] Plaintiffs and Defendants only discuss *Merrimack* in their briefing as it relates to control, which we do not address. However, because *Merrimack* addresses the effect of a legal interest, or lack thereof, on privity between parties, and the trial court does not specify whether it found *Merrimack* to be convincing as to privity or control, we evaluate *Merrimack* as it relates to privity.

represented by the same counsel. *Id.* at 682, 79 S.E.2d at 169. Carolina Power & Light brought a bill of peace in the hopes the claimants would be "estopped by the judgment in the [warehouse owner's] case" or "restrained from further proceeding by virtue of the agreement for control vested in the agents of the . . . insurance companies." *Id.* at 684, 79 S.E.2d at 170. Carolina Power & Light alleged the insurance companies used a loan payment arrangement called "loan receipts" to pay the claimants which, in effect, vested the "insurance companies with exclusive and irrevocable dominion over the claims and causes of action subsequently sued on in the 20 suits referred to; and that the insurers thus acquired the right to control the handling of said claims and the litigation in respect thereto." *Id.* at 683, 79 S.E.2d at 169. Carolina Power & Light further alleged the attorneys had an interest in the loan receipts; the claims of all the defendants were combined and pooled; and the insurers and attorneys chose the warehouse owner's case as the initial test case. *Id.* at 683–84, 79 S.E.2d at 169–70.

However, unlike the shared legal interest in the trust fund by plaintiffs here, in *Merrimack*, our Supreme Court rejected Carolina Power & Light's argument and was clear that although the various claimants there formed a "community of interest," none of the claimants had a "legal interest" in the warehouse owner's case or each other's cases against Carolina Power & Light; "each claimant endeavor[ed] to secure in his own case damages for the loss of his individual property;" "[t]heir property was not involved;" "[t]hey neither lost or won by it;" "[t]here was no

allegation . . . that these defendants were in open and active control of his case;" and "[t]here was no community of property." *Merrimack*, 238 N.C. at 684, 693, 79 S.E.2d at 170, 176. In short, our Supreme Court said that the only effect of a verdict in one of claimants' cases on the other claimants would be the "sentimental effect of the verdict." *Id.* at 693, 79 S.E.2d at 176. Thus, *Merrimack* does not negate privity in the facts of this case; rather, it supports privity because of the shared legal interest in the trust fund between Plaintiffs and the Justuses, into which any damages awarded on judgment in either's case would be placed into a shared trust fund. *See id.* at 693, 79 S.E.2d at 176; *see also Meacham v. Larus & Bros. Co.*, 212 N.C. 646, 648, 194 S.E. 99, 100 (1937) (denying estoppel where a plaintiff "had no legal interest in any judgment that might be rendered therein" and "[n]either was there any privity in estate, in blood, or in law, existing between the plaintiff and [similar party]").

Plaintiffs argue "[m]erely that [Plaintiffs] and Justuses have 'intertwined' interests is insufficient to create privity between them," distinguishing this Court's decision in *Cline* from the instant case because *Cline* is premised on the same factual grievance between the parties in privity, identical property interests, and an agency relationship. However, these arguments do not negate privity here. First, this Court in *Cline* did not premise its holding of privity on the same factual grievance but on the shared financial property rights between the bail bondsman and the bond runner. *Cline*, 148 N.C. App. at 150, 557 S.E.2d at 591 ("This *successive or mutual relationship in the same rights in property* establishes that the interests of both [the bond runner]

and [the bail bondsman] are so intertwined that privity exists between them." (emphasis added)). Second, whether this Court in *Cline* found the exact distribution of the financial property interest to be dispositive does not work against privity here, as the memorandum of understanding creating the trust fund here does not adjust Plaintiffs' interests in the trust fund until a later date; thus, each plaintiff-signatory to the memorandum would have an equal legal right to the trust fund at present. Third, *Cline* does not premise its holding of privity on the agency relationship between the bail bondsman and bond runner because the bond runner did not sue as an agent of the bail bondsman. *Cline*, 148 N.C. App. at 148, 557 S.E.2d at 589 (stating the bond runner "filed an action against [the Clerk of Court] in his official capacity based on [the] defendant's refusal to allow him to write bonds in Sampson County"). Moreover, it is "well established that '[t]he relationship of principal and agent or master and servant does not create [the] privity.'" *Gregory v. Penland*, 179 N.C. App. 505, 512, 634 S.E.2d 625, 630 (2006) (alterations in original) (quoting *Kayler v. Gallimore*, 269 N.C. 405, 408, 152 S.E.2d 518, 521 (1967)).

Plaintiffs also briefly raise due process concerns; however, since we hold there to be privity between Plaintiffs and the Justuses, there are no due process concerns. *See In re A.D.H.*, 388 N.C. 578, 585, 923 S.E.2d 714, 718 (2025) ("The privity requirement is a constitutionally necessary due process protection." (citing *Postal Tel. Cable Co. v. City of Newport*, 247 U.S. 464, 476 (1918))). Thus, the Justuses and

Plaintiffs are in privity. *See id.* at 578, 923 S.E.2d at 714. Therefore, we need not address Defendant's alternate "*Lassiter*-exception" argument.

## B. Collateral Estoppel

Second, Defendants argue "[i]f [Plaintiffs] are bound by the result of *Justus v. Rosner*, Park Ridge is entitled to summary judgement." Specifically, Defendants argue Plaintiffs would be bound by the verdict in *Justus* under the doctrine of collateral estoppel. We agree.

As noted, for collateral estoppel, "parties and parties in privity with them— even in unrelated causes of action—are precluded from retrying fully litigated issues that were decided in any prior determination [between the parties or their privies] and were necessary to the prior determination." *Hales*, 337 N.C. at 333, 445 S.E.2d at 594 (alteration on original) (quoting *King,* 284 N.C. at 356, 200 S.E.2d at 805). In discussing collateral estoppel, our Supreme Court recently stated, "[o]ur precedents articulating the doctrine have hardly been models of clarity;" thus, it gave clear elements for when a court should apply collateral estoppel. *A.D.H.*, 388 N.C. at 584, 923 S.E.2d at 718. Our Supreme Court instructed,

> to apply collateral estoppel to particular issues, those issues must: (1) be the same as those involved in the prior action; (2) have been raised and actually litigated in the prior action; (3) have been material and relevant to the disposition of the prior action; and (4) have had a determination in the prior action that was necessary and essential to the resulting judgment.

*Id.* at 584–85, 923 S.E.2d at 718 (internal marks and citations omitted). "[E]ven if the subsequent action is based on an entirely different claim, collateral estoppel bars the subsequent adjudication of a previously determined issue." *Bishop v. Cnty. of Macon*, 250 N.C. App. 519, 523, 794 S.E.2d 542, 547 (2016) (citation modified). In this appeal, the contested issues regarding the theory of Defendants' negligence are premised on the same relevant theory raised, litigated, and determined in *Justus*.

First, we review whether the negligence issues here are "the same as those involved in the prior action." *See A.D.H.*, 388 N.C. at 584–85, 923 S.E.2d at 718. In this case, Plaintiffs allege negligence on behalf of Defendants because of the following:

> (a) Failing to conduct appropriate background information checks and other investigations into the past performance of DR. ROSNER at other medical facilities;
>
> (b) Failing to closely monitor DR. ROSNER's performance during his initial probationary privileging period;
>
> (c) Failing to evaluate the medical necessity of the procedures performed by DR. ROSNER;
>
> (d) Failing to place into effect quality monitoring activities to review the appropriateness of the surgical procedures performed by DR. ROSNER; and
>
> (e) Failing to investigate or to take action when it became known that excessive numbers of surgeries to correct a rare congenital anomaly were being performed by DR. ROSNER.

These allegations of negligence are identical to the allegations of negligence against Defendants in *Justus*, which alleged,

(a) Failing to conduct appropriate background information checks and other investigations into the past performance of DR. ROSNER at other medical facilities;

(b) Failing to closely monitor DR. ROSNER's performance during his initial probationary privileging period;

(c) Failing to evaluate the medical necessity of the procedures performed by DR. ROSNER;

(d) Failing to place into effect quality monitoring activities to review the appropriateness of the surgical procedures performed by DR. ROSNER; and

(e) Failing to investigate or to take action when it became known that excessive numbers of surgeries to correct a rare congenital anomaly were being performed by DR. ROSNER.

Furthermore, the jury instructions for finding Defendant Park Ridge negligent in *Justus* did not limit the issue of negligence to Ms. Justus but also to all of Dr. Rosner's and Defendant Park Ridge's patients, instructing the jury had to find Defendant Park Ridge "was negligent in one or more of the following ways" for it to be found negligent:

1. Failed to contact practicing Neurosurgeons who are or were familiar with Dr. Rosner's practice during Dr. Rosner's credentialing and re-credentialing process other than those listed by Dr. Rosner;

2. Failed to adequately investigate and review prior lawsuits against Dr. Rosner at the University of Alabama;

3. Failed to adequately investigate and review Dr. Rosner's problems and to investigate the reasons for leaving the UAB;

- 30 -

4. Failed to adequately investigate Dr. Rosner's reasons for leaving Charlotte, NC;

5. Failed to adequately investigate why Dr. Rosner was denied privileges at certain Charlotte, North Carolina hospitals;

6. Failed to put in place an institutional review board;

7. Failed to adequately monitor Dr. Rosner by employing the services of an independent neurosurgeon;

8. Failed to follow its policies and procedures with respect to Dr. Rosner and his treatment of *his patients* prior to performing services by insuring that Dr. Rosner complied with or followed the policies of the hospital when the services rendered by Dr. Rosner were experimental;

9. Failed to have adequate safeguards in place to protect *Park Ridge Hospital patients* from unnecessary surgeries performed by Dr. Rosner;

10. Failed to have an adequate peer review;

11. Conspired with Dr. Rosner to perform medically unnecessary surgeries at Park Ridge Hospital for financial profit;

12. Fraudulently abused their position of trust within the community promoting controversial and/or experimental surgeries by Dr. Rosner at Park Ridge Hospital; and,

13. Marketed Dr. Rosner's surgical procedures without monitoring the same.

Plaintiffs concede the negligent credentialing issue is identical and was actually litigated, but Plaintiffs argue "[t]hat these cases arise from different surgeries on different patients at different times," precluding estoppel because

"Plaintiffs' experts will testify here that [Defendant] Park Ridge was negligent *'during the time period [Dr.] Rosner operated on Plaintiff Steven Collar.'*"[4] However, further review of the record beyond the pleadings and jury instructions indicates Defendants' negligence at issue in this case is identical to Defendant Park Ridge's negligence as determined in *Justus*. Plaintiffs stated they "plann[ed] on using the same experts -- hospital experts, as [they] used in [*Justus*]" and further stated their experts' testimonies would be the same in each of the Rosner trust fund plaintiffs' cases, saying,

> If, for example, Dr. Latchaw, when he was being deposed, the defense wanted to depose him at a different time in every case. And he became frustrated and said, "Look, my testimony is the same in every one of these cases. They are all the same." Now -- and that's going to be the testimony from the plaintiffs' experts.

This was reiterated on Plaintiffs' Designation of Witnesses, where each expert who testified in *Justus* and was also slated to testify in the present case was designated to testify "in a manner generally consistent with [their] testimon[ies] . . . in the Justus

---

[4] Although not dispositive, we note in prior filings within the record, which were not arguing in the alternative nor contained any indication of the sort, Plaintiffs argued all of the Rosner cases were similar. For example, in Plaintiffs' motion to consolidate Plaintiffs argued "the same issues recur in all cases. The legal issue is identical since [] Defendants owed the same duty to all Plaintiffs." Additionally, in Plaintiffs' motion to lift the stay, Plaintiffs argued, in part,

> iv. The premise of all these cases is that Dr. Rosner performed unnecessary surgery on all these patients, failed to obtain their informed consent to the experimental and controversial nature of the surgery, and that [] [D]efendants knew or should have known of the experimental and controversial nature of these surgical procedures yet failed to use reasonable care and diligence in protecting the patients' safety[.]

lawsuit against these Defendants." Further, Plaintiffs' new designated expert witnesses—Drs. Fine, Freeman, and Moreno—are designated to testify as to the same alleged issues of Defendants' negligent credentialing, oversight, monitoring, and marketing of Dr. Rosner and his practice, and after testifying to Defendants' negligence, they would testify that this negligence was the proximate cause of Plaintiffs' injury. However, the fundamental issue of Defendants' negligence is the same issue as in *Justus* regardless of the proximate cause, for Defendants must have been found to have negligently breached a duty owed to Plaintiffs before proximate cause need be established as to Plaintiffs.[5]

Plaintiffs cite *Bockweg v. Anderson,* 333 N.C. 486, 428 S.E.2d 157 (1993), in support of the denial of summary judgment. But our Supreme Court was clear in *Bockweg*, collateral estoppel was not at issue; rather, *res judicata* was at issue regarding separate claims where "the pleadings upon which the judgment in [a] prior action was based did not raise the claim now presented." *Bockweg*, 333 N.C. at 492, 496, 428 S.E.2d at 161, 164 ("[The d]efendants make no contention that the issues relating to the diagnosis and treatment of the pelvic infection were actually litigated

---

[5] *See Estate of Long ex rel. Long v. Fowler*, 388 N.C. 308, 314, 920 S.E.2d 799, 804 (2025) ("To establish actionable negligence, a plaintiff must show that: (1) the defendant failed to exercise due care in the performance of some legal duty owed to the plaintiff under the circumstances; and (2) the negligent breach of such duty was the proximate cause of the injury. . . . The law does not charge a person with all the possible consequences of his negligence, nor that which is merely possible. If the connection between negligence and the injury appears unnatural, unreasonable and improbable in the light of common experience, the negligence, if deemed a cause of the injury at all, is to be considered a remote rather than a proximate cause." (citation modified)).

and determined in the prior federal action. Thus, they do not argue collateral estoppel."). Therefore, *Bockweg* is inapplicable to our collateral estoppel analysis. *See id.* at 492, 496, 428 S.E.2d at 161, 164.

Thus, both *Justus* and the case on appeal contained the identical issue of Defendants' negligence. *See A.D.H.*, 388 N.C. at 584–85, 923 S.E.2d at 718.

Second, we review whether Defendants' negligence "ha[s] been raised and actually litigated in the prior action." *Bockweg*, 333 N.C. at 496, 428 S.E.2d at 164. "A very close examination of matters actually litigated must be made in order to determine if the underlying issues are in fact identical." *Beckwith v. Llewellyn,* 326 N.C. 569, 574, 391 S.E.2d 189, 191 (1990). "[A]n issue is actually litigated, for purposes of collateral estoppel or issue preclusion, if it is properly raised in the pleadings or otherwise submitted for determination and [is] in fact determined." *Williams v. Peabody*, 217 N.C. App. 1, 6, 719 S.E.2d 88, 93 (2011) (quoting *City of Asheville v. State,* 192 N.C. App. 1, 17, 665 S.E.2d 103, 117 (2008)). As noted, the pleadings in both *Justus* and the case here raise identical claims of negligence against Defendant; the jury instructions instructed the jury as to Defendant Park Ridge's negligence generally, not solely for one patient, forming the basis for the jury's verdict on Defendants' negligence; and Plaintiffs concede the negligent credentialing issue was actually litigated. Moreover, during trial, the issues of whether Defendant Park Ridge "act[ed] appropriately in the credentialing of Dr. Rosner;" whether "Dr. Rosner's activities . . . fall under the category of research and was that properly

addressed by the institution[, Defendant Park Ridge];" whether "[Defendant Park Ridge] actually appropriately overs[aw] and review[ed] [Dr. Rosner's] activities on an ongoing basis;" and what Defendant Park Ridge "was saying to the public about Dr. Rosner" in its "marketing" were raised before the jury.

Thus, as discussed further below, in finding Defendant Park Ridge was not negligent regarding Ms. Justus, the jury had to conclude Defendant Park Ridge was not negligent in credentialing Dr. Rosner, was not negligent in allowing Dr. Rosner's research at its hospital, was not negligent in its oversight and review of Dr. Rosner's activities, and was not negligent in its public statements and marketing regarding Dr. Rosner. Therefore, the issue of Defendants' negligence was actually litigated and decided in *Justus*. *See Peabody*, 217 N.C. App. at 6, 719 S.E.2d at 93.

Third and fourth, we review if the issues have been "material and relevant to the disposition of the prior action and have had a determination in the prior action that was necessary and essential to the resulting judgment." *A.D.H.*, 388 N.C. at 584–85, 923 S.E.2d at 718 (citation modified). Plaintiffs argue "[t]here's no way to be sure what the jury actually found [in *Justus*], hence insufficient grounds for collateral estoppel" because the jury had to find Defendant Park Ridge negligent and also find Ms. Justus was injured by this negligence. However, "[a] jury is presumed to follow the court's instructions, and we must therefore presume that the jury based its verdict on these instructions." *Ingram v. Henderson Cnty. Hosp. Corp., Inc.*, 259 N.C. App. 266, 284, 815 S.E.2d 719, 731 (2018) (quoting *Ridley v. Wendel*, 251 N.C. App.

452, 460, 795 S.E.2d 807, 813–14 (2016)). Similarly, our Supreme Court indicated

courts may look beyond the judgment to see what was determined by the jury, saying,

> In discovering what issues were determined by the
> judgment in a prior action, the court in the second action is
> free to go beyond the judgment roll, and may examine the
> pleadings and the evidence in the prior action. And if the
> rendering court made no express fin[d]ings on issues raised
> by the pleadings or the evidence, the court may infer that
> in the prior action a determination appropriate to the
> judgment rendered was made as to each issue that was so
> raised and the determination of which was necessary to
> support the judgment.

*King*, 284 N.C. at 360, 200 S.E.2d at 807–08 (quoting 1B James W. Moore et al.,

Moore's Federal Practice § 0.443(4) (2d ed. 1965)).

In this case, the following verdicts were given by the jury:

> 2. Was Pamela Justus injured by the negligence of the
> defendant Fletcher Hospital, Incorporated, d/b/a Park
> Ridge Hospital? (Answer "YES" or "NO" in the space
> provided below.)
>
> ANSWER: No
>
> . . . .
>
> 4. Was the death of Pamela Justus caused by the
> negligence of the defendant Fletcher Hospital,
> Incorporated, d/b/a Park Ridge Hospital? (Answer "YES" or
> "NO" in the space provided below.)
>
> ANSWER: No

While the verdicts expressly reference Ms. Justus, as discussed above, the

evidence adduced and discussed during the *Justus* trial, along with Plaintiffs' experts'

intention to reiterate their same testimony as in *Justus*, identical claims of negligence against Defendant Park Ridge in both the *Justus* and *Collar* pleadings, and the jury instructions indicates the jury's verdict was premised on Defendant Park Ridge's general negligence, forming the material and necessary basis for the jury's finding Defendant Park Ridge to not be negligent regarding Ms. Justus's injury and death. *See King*, 284 N.C. at 360, 200 S.E.2d at 807–08.

Notably, the trial court's jury instructions did not solely focus on Ms. Justus's injury and death; the instructions focused on Defendant Park Ridge's negligence as a whole, expressly instructing the jury in order to find Defendant Park Ridge negligent, it needed to find, in part, whether Defendant Park Ridge "[f]ailed to follow its policies and procedures with respect to Dr. Rosner and his treatment of [Dr. Rosner's] *patients"* and whether Defendant Park Ridge *"*[f]ailed to have adequate safeguards in place to protect *Park Ridge Hospital patients* from unnecessary surgeries performed by Dr. Rosner." (Emphasis added). This was in addition to the instructions for the jury as to whether Defendant Park Ridge was negligent in credentialing Dr. Rosner; in "[f]ail[ing] to adequately monitor Dr. Rosner;" in failing to put into place an institutional review board; in "[f]ail[ing] to have an adequate peer review;" in "[c]onspir[ing] with Dr. Rosner to perform medically unnecessary surgeries at Park Ridge Hospital for financial profit;" in "[f]raudulently abus[ing] their position of trust within the community promoting controversial and/or experimental surgeries by Dr. Rosner at Park Ridge Hospital;" and in "[m]arket[ing] Dr. Rosner's surgical

procedures without monitoring the same." Based on these jury instructions, when the jury determined Ms. Justus was not injured by the negligence of Defendant Park Ridge nor was her death caused by its negligence, we presume the jury "follow[ed] the [trial] court's instructions, and we must therefore presume that the jury based its verdict on these instructions." *See Ingram*, 259 N.C. App. at 284, 815 S.E.2d at 731 (quoting *Ridley*, 251 N.C. App. at 460, 795 S.E.2d at 813–14). Therefore, Defendant Park Ridge's negligence was "material and relevant to the disposition of [*Justus*] and have had a determination in [*Justus*] that was necessary and essential to the resulting judgment," finding no negligence on behalf of Defendant Park Ridge regarding Ms. Justus' injury and death. *See A.D.H.*, 388 N.C. at 584–85, 923 S.E.2d at 718 (citation modified).

Considering our review of the record and *Justus*, we hold "there is no genuine issue as to any material fact." *See Forbis*, 361 N.C. at 523–24, 649 S.E.2d at 385 (quoting N.C. R. Civ. P. 56(c)). Therefore, Plaintiffs are collaterally estopped from pursuing their allegations of negligence against Defendants.[6]

## C. Negligent Credentialing as a "Derivative Claim"

---

[6] We note since the claims against Defendant Adventist Sunbelt are based on the doctrine of respondeat superior, premised on the negligence of Defendant Park Ridge, the application of collateral estoppel to the issue of Defendant Park Ridge's negligence in the *Justus* jury verdict would defeat the claims against Defendant Adventist Sunbelt. *See Hudson v. Gulf Oil Co.*, 215 N.C. 422, 427, 2 S.E.2d 26, 29 (1939) ("If the act of the agent or employee is not negligent, or does not proximately cause the injury complained of, the master is not liable.").

Third, Defendants file a petition for writ of certiorari arguing this Court should hear its third issue, "[w]hether [Defendant] also was entitled to summary judgment because negligent credentialing is a derivative claim that requires a viable underlying claim." Because we hold Plaintiffs' claims against Defendants are collaterally estopped and summary judgment be entered for Defendant, we need not reach this issue and dismiss Defendants' PWC as moot.

## D. Judicial Estoppel

Fourth, Plaintiffs raise an additional issue, arguing the trial court erred in "holding that judicial estoppel cannot preclude [Defendant] Park Ridge from invoking collateral estoppel" and "rests on a mistaken assumption of law," constituting "an abuse of discretion." We disagree.

"[T]he purpose of judicial estoppel [is] to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 28, 591 S.E.2d 870, 888 (2004) (citation modified). Our Supreme Court has emphasized "our recognition of judicial estoppel is limited to the context of inconsistent factual assertions and that the doctrine should not be applied to prevent the assertion of inconsistent legal theories." *Id.* at 32, 591 S.E.2d at 890. "Judicial estoppel requires proof of three elements: (1) the party's subsequent position is clearly inconsistent with an earlier position; (2) the earlier position was accepted by a court, thus creating the potential for judicial inconsistencies; and (3) the change in positions creates an unfair

advantage or unfair detriment." *N.C. State Bar v. Gilbert*, 189 N.C. App. 320, 328, 663 S.E.2d 1, 7 (2008) (citing *Whitacre P'ship,* 358 N.C. at 29, 591 S.E.2d at 888–89).

We review for abuse of discretion and will only reverse "upon a showing that [the trial court's] ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *Old Republic Nat'l Title Ins. Co.*, 369 N.C. at 507, 797 S.E.2d at 269.

Here, the trial court stated it was "not convinced that the position taken by [] Defendants in opposing the Motion for Consolidation operates as any sort of judicial estoppel on the question of whether or not the corporate negligence issues are identical in the two cases." Plaintiffs argue Defendants' previous arguments against consolidation and subsequent argument for collateral estoppel, that because nothing in the theory of negligence against Defendants is plaintiff-specific, constitute a basis for the application of judicial estoppel.[7] However, the motion for consolidation occurred after the *Justus* trial, not involving whether *Justus* and the instant case had overlapping factual issues for purposes of collateral estoppel. Further, Defendants' response to the motion for consolidation argued some of the surgeries in the Rosner litigation presented factual inquiries as to whether Dr. Rosner's surgery was indeed experimental, which is not "clearly inconsistent" with Defendants' argument the jury

---

[7] Plaintiffs also characterize the trial court's denial of judicial estoppel as a "misapprehension of law." However, the trial court's order does not appear to misapprehend the law; rather, it did not find judicial estoppel applicable to Defendants' arguments here. We hold the same.

in *Justus* decided the identical issue of Defendants' negligence on appeal before this Court. *See Gilbert*, 189 N.C. App. at 328, 663 S.E.2d at 7. Moreover, Defendants filed their response to consolidation the same day they filed a motion to amend their answers and defenses, raising res judicata and/or collateral estoppel at issue here, and included the following statement in their response to consolidation, notifying the trial court this argument was an alternative argument:

> The argument set forth in this response is in the alternative to the position of [D]efendants set forth in the motion to amend filed this same date which asserts that the jury's verdict in the case of the *Justus v. Rosner, et. al.*, 03 CvS 977, is res judicata and/or collateral estoppel as to [P]laintiffs' claims against [D]efendants in the above-captioned cases.

Thus, without "clearly inconsistent" factual arguments present and with the trial court on notice as to Defendants' arguments of collateral estoppel as well as their alternate argument in response to Plaintiffs' motion to consolidate, we are unable to say the trial court's denial of judicial estoppel "was manifestly unsupported by reason and could not have been the result of a reasoned decision." *See Old Republic Nat'l Title Ins. Co.*, 369 N.C. at 507, 797 S.E.2d at 269.

Therefore, we affirm the trial court's decision to deny judicial estoppel here.

### III. Conclusion

For the foregoing reasons, we affirm the trial court's order denying the applicability of judicial estoppel, reverse the trial court's denial of the motion for summary judgment, remand to the trial court with instruction to grant the summary

judgment in favor of Defendant, and dismiss the petition for writ of certiorari.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judge STADING concurs.

Judge ARROWOOD concurs in part and dissents in part by separate opinion.

No. COA25-482 – *Collar v. Fletcher Hospital, Inc.*

ARROWOOD, Judge, concurring in part and dissenting in part.

I concur in the portion of the majority opinion affirming the part of the order that denied judicial estoppel and I agree that the PWC should be dismissed as moot. However, I disagree with the majority's conclusion that defendants' motion for summary judgment should be granted.

I believe the trial court correctly determined there were genuine issues of material fact, as this case presents facts and evidence that were not addressed in the *Justus v. Rosner* trial. In my view, in order to succeed in their motion defendants were required to prove that both the shared financial interests and the issues presented in each case were wholly identical, but they have failed to do so. Accordingly, I respectfully dissent.

Under the doctrine of collateral estoppel, "the determination of an issue in a prior judicial or administrative proceeding precludes the relitigation of that issue in a later action, provided the party against whom the estoppel is asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding." *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 15 (2004) (citations omitted). "For purposes of collateral estoppel, 'the prior judgment serves as a bar *only as to issues actually litigated* and determined in the original action.'" *Williams v. Peabody*, 217 N.C. App. 1, 6 (2011) (quoting *City of Asheville v. State,* 192 N.C. App. 1, 17 (2008)) (emphasis in original). "An issue is actually litigated, for purposes of collateral estoppel or issue preclusion, if it is properly raised in the pleadings or otherwise submitted for determination and

is in fact determined." *Id.* (cleaned up). "A very close examination of matters actually litigated must be made in order to determine if the underlying issues are in fact identical[;] [i]f they are not identical, then the doctrine of collateral estoppel does not apply." *Id.* (citation omitted).

As our Supreme Court has recognized, the meaning of privity for purposes of collateral estoppel "is somewhat elusive." *Hales v. N.C. Ins. Guar. Ass'n*, 337 N.C. 329, 333 (1994) (citing *Settle v. Beasley,* 309 N.C. 616, 620 (1983)). "The prevailing definition that has emerged from our cases is that 'privity' . . . 'denotes a mutual or successive relationship to the same rights of property.' " *Id.* at 334 (citations omitted). Privity may also exist where a party controlled the prior litigation and had a proprietary interest in the judgment or in the determination of a question of law or facts on the same subject matter. *Thompson v. Lassiter*, 246 N.C. 34, 39–40 (1957).

Defendants contend this case is essentially the same as *Cline v. McCullen*, 148 N.C. App. 147 (2001). In *Cline*, a plaintiff bail bondsman filed a complaint against a defendant clerk of court after the clerk suspended the plaintiff's agent from writing bonds due to an unrelated criminal matter. *Id.* at 148. The plaintiff's agent received a fifty percent commission on plaintiff's bonds, with rights granted to him based on the power of attorney he received from plaintiff. Accordingly, this Court found that in the agent's earlier lawsuit against defendant, "he was in essence suing for the lost profits of plaintiff from whom he derived his commission. This successive or mutual relationship in the same rights in property establishes that the interests of both [the

agent] and plaintiff are so intertwined that privity exists between them." *Id.* at 150. Although the Court concluded there was insufficient evidence to show that plaintiff controlled the prior litigation (wherein plaintiff attended a law office meeting and was "actively involved in the discussions that took place at the meeting") the Court did consider the findings to be supportive of a determination that the plaintiff and agent were in privity. *Id.* at 150–51.

I fail to see how *Cline* is "directly on point" as defendants claim. *Cline* involves an agency relationship, with the plaintiff and agent directly in business with each other to the extent that the agent's commission was granted via power of attorney from plaintiff. Additionally, the first lawsuit in *Cline* for the agent's commission was intertwined with the plaintiff's lost profits and related to the same injury. In this case, by contrast, plaintiffs have some connection to the *Justus* plaintiffs by virtue of the Memorandum of Understanding, and each case features the same defendants, but crucially, this case concerns separate and distinct questions of fact. The *Justus* trial did not encompass the factual allegations of plaintiff Stephen Collar's injuries nor his claims against defendants for negligent credentialing and supervision with respect to his treatment. Defendants have not shown that the factual allegations of negligence against them in this case were identical to those in the *Justus* trial. Each subsequent case may include different factual circumstances with respect to defendants' negligence in credentialing or supervision as they became more aware of Dr. Rosner's actions. Simply put, plaintiffs have not yet had the opportunity to fully litigate their

3

case to reach a determination on their claims.

The Memorandum of Understanding reflects that plaintiffs "understand and agree that any award received by us, or by other Plaintiffs in this litigation, will be placed in a Trust Fund and will be subsequently divided among some or all of the Plaintiffs based upon the decision of one or more arbitrators." The Memorandum does not specify equal shares in the Trust, nor does it create the "mutual and successive relationship to the same rights of property" contemplated in *Hales*. There is no specification or other mechanism to render the shared financial interests "an identical legal interest" sufficiently intertwined as to create privity.

If anything, the Memorandum of Understanding was a conflict waiver; the final paragraph of the Memorandum reads "We understand that, . . . it could be a conflict of interest for our attorneys to recommend that the trial of one client occur before the trial of another client. **We specifically waive any such conflict of interest and authorize our attorneys to act as described hereinabove.**" The latter sentence is the only bolded text in the Memorandum.

I agree with the trial court that *Carolina Power & Light Co. v. Merrimack Mutual Insurance Co.*, 238 N.C. 679 (1953) is particularly instructive. *Carolina Power* featured twenty related lawsuits stemming from the same incident, brought against the same defendant by the same counsel, and with similar allegations of negligence throughout. Our Supreme Court noted that in the first case tried, "none of the twenty other claimants had any legal interest. Their property was not involved.

4

They neither won nor lost by it. The status of their cases was unchanged save for the sentimental effect of the verdict." *Id.* at 693. With respect to control, the Court found that "[a]t most, it may be said that her insurance company's agent agreed that the Fleming case be tried first. All the cases stood upon the same footing, each claimant endeavoring to secure in his own case damages for the loss of his individual property." *Id.*

This case is quite similar. Although it is true that the Memorandum of Understanding indicates a shared legal interest among the Rosner plaintiffs, each plaintiff had their own legal interests flowing from their individual and separate injuries. The status of their cases may have changed incrementally with each award placed in the Trust Fund, but the Memorandum includes no guarantee, only providing that the Trust Fund "will be subsequently divided among some or all of the Plaintiffs based upon the decision of one or more arbitrators." The Memorandum did not otherwise foreclose the plaintiffs' ability to pursue an award.

Additionally, the fact that plaintiffs had the same trial counsel as the *Justus* plaintiffs alone does not support the conclusion that the Collar plaintiffs exercised control over the *Justus* trial. In *Lassiter*, our Supreme Court found that a sufficient level of control existed where the plaintiff acted as guardian ad litem for his son in another action, taking "every action he could have taken if he had been a defendant himself." *Lassiter*, 246 N.C. at 39. In that capacity, "he exercised complete control of his son's defense including the right of appeal. In doing so, he necessarily was

5

defending the cross-action as much for his own protection as for that of his son." *Id.* at 40. "The mere fact that he was his son's guardian ad litem did not remove the factual existence of the relationship of principal and agent that existed between the father and the son with respect to the very matter in litigation." *Id.*

The relationships in this case are clearly different. The Collar plaintiffs do not have a principal and agent relationship to the Justus plaintiffs, nor to any of the other plaintiffs harmed by Dr. Rosner. Although the litigation approach in the *Justus* trial may have been similar to the intended approach in a Collar trial, that does not amount to the Collars taking every action they could have taken as if they were the plaintiffs themselves in the *Justus* trial. As previously discussed, the Collar plaintiffs had distinct injuries that were not litigated in the *Justus* trial.

In sum, I do not believe these facts present sufficient connections to establish privity or to fit within the *Lassiter* exception. I would affirm the trial court's well-reasoned denial of the motion for summary judgment and remand for further proceedings. I respectfully dissent.